UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>(10)  STEPHEN SEMPREVIVO, )<br>)<br>Defendant )<br>) | Criminal No.: 19-10117-IT |

## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

### Introduction

The government respectfully submits this supplemental memorandum in connection with the sentencing of defendant Stephen Semprevivo.

Semprevivo, an affluent business executive,[1] paid one of the largest single bribes of any of the parents charged in this conspiracy to date—$400,000—to have his son fraudulently recruited to Georgetown University as a tennis player even though his son did not play competitive tennis. Over a period of months, Semprevivo involved his son as an active and knowing participant in the scheme, causing him to send e-mails to the corrupt Georgetown coach in furtherance of the fraud, and to submit essays and applications that father and son both knew featured fake tennis credentials. When Semprevivo felt the scheme unraveling, he quickly, falsely disclaimed any knowledge of it in a recorded call with co-conspirator William "Rick" Singer.

Moreover, despite pleading guilty, Semprevivo has been something less than a model of contrition. In May 2019—days after the Court accepted his guilty plea—he *sued Georgetown*

---

[1] Semprevivo is, among other things, the former executive vice president and chief strategy and growth officer of Cydcor, Inc.

*University* to enjoin it from expelling his son. That suit, filed in the name of Semprevivo's son, characterized Semprevivo's actions in innocent terms, including by falsely suggesting that, as far as Semprevivo was aware, Singer had simply enlisted the Georgetown coach, Gordie Ernst, as a "friend" to offer a "recommendation" for Semprevivo's son. Remarkably, the suit blamed *Georgetown* for failing to catch the lies in his son's application and sought damages for breach of contract and unjust enrichment.

The suit has since been withdrawn, but Semprevivo continues to search for ways to blame other people for his own knowing, intentional—and admitted—criminality. Beyond generally shifting responsibility for his actions to Singer, he also blames childhood psychological trauma for "undermin[ing] his reasoning" and "contributing to the poor decisions." But his argument is premised on a misleading timeline of his own activities that ignores their extended duration, the numerous opportunities he had to reconsider and back out, and the multiple points at which he instead chose to enable the scheme and to reaffirm his commitment to fraud.

Semprevivo's bribe payment shows just what the fraud was worth to him. He then made his son an active participant in a long-term federal crime. Even after pleading guilty, he abused the legal process in an effort to preserve the benefits of that crime (his son's attendance at Georgetown)—thereby demonstrating, in spectacular fashion, a complete lack of remorse. Prison is the only appropriate sentence in these circumstances. Semprevivo should be sentenced to a term of 13 months in prison, a fine of $95,000, 12 months of supervised release, and restitution of at least $105,341.69.[2]

---

[2] The table of recommended sentences in the government's Consolidated Sentencing Memorandum indicated that the government would seek a sentence of 15 months for Semprevivo. This was a typographical error. As the memo elsewhere noted, the government seeks a sentence for Semprevivo that is modestly shorter than the 15 months it seeks for co-defendant Agustin Huneeus.

## I. Semprevivo Participated in the Fraud for Months and Involved His Minor Child

Semprevivo committed his fraud over many months. During that time, the illicit nature of the scheme and the fact that Ernst, the Georgetown tennis coach, was complicit in it were unambiguous and known to Semprevivo. The scheme hinged on enlisting Semprevivo's minor child to lie—to repeatedly hold himself out as a competitive tennis player deserving of recruitment by Georgetown.

For example, two months before submitting his son's application to Georgetown, Singer told Semprevivo by e-mail to have his son send a message to Ernst expressing interest in playing tennis at Georgetown. Semprevivo's son sent the e-mail later that same day:

```
From:           ▇▇▇ Semprevivo <▇▇▇@▇▇▇.com> on behalf of ▇▇▇ Semprevivo
                <▇▇▇@▇▇▇.com>
To:             ▇▇▇@georgetown.edu
Sent:           8/19/2015 11:34:53 PM
Subject:        Summer Update
Attachments:    ▇▇▇Semprevivo - Grades.PDF; ▇▇▇Semprevivo - SAT.PDF


Dear Coach Ernst

I wanted to update you on my summer doings. After your suggestion I have played very well with terrific success in Doubles this summer and played quite well in singles too.

I am looking forward to having a chance to play for you. Our conversations have inspired me to try to dominate my competition this summer.

Senior year is about to start and you can count on me to achieve great grades.

Thanks for the chance to play for you and Georgetown University.

Safe travels back from Cape Cod.

▇▇▇Semprevivo
```

The defendant and his son knew the e-mail was a sham, and Semprevivo knew it was the opening move in the fraud scheme. Semprevivo's son did not play competitive tennis. He had never met Ernst. He neither intended, nor was he qualified, to play tennis at Georgetown.

In October 2015, Singer e-mailed Semprevivo and his son an essay that had been concocted for the son's Georgetown application. The subject line was explicit: "This is the Final for Activity for Gtown."

| | |
|---|---|
| **From:** | Rick Singer <█@█.com> |
| **Sent:** | Sunday, October 11, 2015 12:15 AM |
| **To:** | Mikaela Sanford <█@█.com>; █ Semprevivo <█@█.com>; Stephen Semprevivo <█@█.net> |
| **Subject:** | This is the Final for Activity for Gtown- MIKAELA USE THIS ONE |

When I walk into a room, people will normally look up and make a comment about my height – I'm 6'5 – and ask me if I play basketball. With a smile, I nod my head, but also insist that the sport I put my most energy into is tennis. I've been bigger than kids in my classes for as long as I can remember; my parents signed me up for tennis to help me with my coordination. Of course, initially, my footwork was awkward. I had trouble getting my long limbs and big feet to catch up with my torso. Yet as I grew older, I learned to put my body and mind in sync.

The turning point in my abilities came when my coach one day asked me to watch a video of professional boxers with him. He asked me what made them such incredible athletes. My instinct was to say that it was based on their toughness, but he explained that the best athletes – no matter what sport they played - all had perfect balance. It was at that moment that he tossed me a jump rope: my footwork training was about to begin.

At first, I was skeptical about how jumping rope could possibly help me with my tennis performance. Yet I saw that my footwork and my height soon gave me an advantage; the power behind my serve rose by many miles per hour and smaller players were not running me around the court. I felt more confident moving forward; I knew that by playing to my strengths and finding my balance – both literally and figuratively - I could be the best player I could be

The lies in the essay were necessary to the fraud, and Semprevivo and his son readily adopted them. Semprevivo understood their purpose: to make it appear that his son was a recruitable tennis player when he was not, and to enable Ernst to perpetuate that lie to facilitate the fraudulent admission to Georgetown in exchange for a bribe.

In the two weeks after the falsified application to Georgetown, Semprevivo's son submitted applications to the University of Michigan and Tulane University. Unlike the Georgetown application, those applications did not contain the falsified claims about his tennis skills.

On November 6, 2015, Georgetown sent Semprevivo's son a "likely" letter, noting that he had a greater than 95 percent chance of admission based on a review conducted "at the request of

Mr. Gordie Ernst, Tennis Coach." The letter noted that a formal decision would be rendered by April 1, 2016. Three weeks later, Semprevivo's son submitted additional applications to the University of Southern California and Vanderbilt University. Like the Michigan and Tulane applications, the USC and Vanderbilt applications did not suggest that Semprevivo's son played tennis.

By April 2016, Semprevivo's son had been formally admitted to Georgetown, and Semprevivo caused his family trust to issue a check for $400,000 to Singer's sham charity, the Key Worldwide Foundation ("KWF"). The check was dated April 28, 2016—more than eight months after the false e-mail Semprevivo's son sent to Ernst in August. From that same KWF account, Singer, in turn, paid Ernst hundreds of thousands of dollars for facilitating the fraudulent recruitment of Semprevivo's son and the children of his other clients.

In December 2018, Singer called Semprevivo at the direction of law enforcement agents. During the recorded call, Singer updated Semprevivo on a purported audit of KWF by the IRS. Singer said:

> I'll tell you what I have not told them. I did not tell them that [your son] was-- that he got in through tennis and that he wasn't a tennis player, but that you guys made a payment to Gordie Ernst in Georgetown tennis. I didn't say that. I just essentially said that [your son] got in through one of my relationships at Georgetown and just left it at that, and that you guys made a donation to our foundation to help underserved kids.

Semprevivo's reply was cagey, though it signaled his complicity in the scheme and his willingness to lie to the IRS to cover it up:

> Okay. Yeah. Yeah. You know, however you-- that-- that-- that, you know, we donate to the-- we donated to the, you know, foundation. It does great work and, you know-- and, you know, we appreciate, you know, any help outside of that that-- that we got from you.

5

In a follow-up call with Singer three months later, Semprevivo abruptly changed tack. This time, when Singer said that Georgetown was conducting an internal investigation to determine why students, like Semprevivo's son, had been admitted to the university through Ernst even though they did not play tennis, Semprevivo became suspicious: Why was Singer rehashing the details of their fraud over the phone? Semprevivo told Singer he was not comfortable continuing the discussion and tried to distance himself from the fraud. He responded with false exculpatory statements like: "[A]ll I know is that we, you know, we used you for the charity stuff and we used you for the counseling, and your dealings are your dealings." He added: "[Y]ou did what you did, Rick, and that was your stuff. Okay? . . . . [Y]ou did what you did and so I'm not going to take accountability for your actions. . . ."

In stark contrast to that call, in March 2019 Semprevivo pleaded guilty to conspiring with Singer and others to commit mail fraud and honest services mail fraud. At the plea colloquy, Semprevivo affirmed that he did not dispute any of the facts set forth by the government, including that he entered into "a conspiracy to deprive Georgetown of the right to the honest services of its employee, Gordon Ernst, through payments of bribes to Ernst in exchange for Ernst agreeing to recruit Semprevivo's son as a tennis player, which would assure his admission to Georgetown." Dkt. 363 at 32:1-35:2. In response to the Court's inquiry, Semprevivo acknowledged that he participated in a scheme pursuant to which he "provided money to Mr. Singer's fund, trust -- false charity. . . . [w]hich he used to pay Mr. Ernst to have Mr. Ernst provide one of the spots at Georgetown -- to designate [Semprevivo's] son for one of the spots at Georgetown with respect to his admission application." *Id.* at 35:25-36:15.

Barely a week later, Semprevivo's attorney filed a lawsuit against Georgetown on behalf of Semprevivo's son. *See Semprevivo v. Georgetown University*, No. 1:19-cv-01400-RJL (D.D.C.

6

May 15, 2019) (Complt.). Implicitly contradicting Semprevivo's sworn admission at his plea hearing, the lawsuit alleged merely that "Semprevivo was informed by Singer that the tennis coach at Georgetown, Gordon Ernst ('Coach Ernst') was a friend, and that Coach Ernst would provide a recommendation for Semprevivo during the admissions process. Coach Ernst, in fact, used one of his assigned admission slots as if he was recruiting Semprevivo to play tennis for Georgetown." *Id.* ¶ 8. The lawsuit sought "compensation . . . for any losses suffered or expenses incurred by Semprevivo's son due to Georgetown's actions" on the theories of breach of contract, promissory estoppel, and unjust enrichment, because Georgetown failed to verify and "debunk[]" the misrepresentations about tennis in Semprevivo's son's application, and "these misrepresentations could have been easily verified and debunked before Georgetown formally admitted Semprevivo in April 2016." *Id.* ¶ 12 & p. 13 (Prayers for Relief). After being amended once in June 2019, the lawsuit was voluntarily dismissed in July. *Semprevivo v. Georgetown University*, No. 1:19-cv-01400-RJL (D.D.C. July 16, 2019) (Notice of Voluntary Dismissal).

## II. Semprevivo Should Be Sentenced to Prison, To Deter Him, To Deter Others, and Because It Is a Just and Proportional Sanction for His Crimes

Semprevivo's months-long involvement in the fraud, his conscription of his son as a participant, his persistent effort to deflect blame for his actions, his willingness to spend $400,000 on a bribe, and his use of frivolous litigation as a weapon to retain the fruits of his crime, require the imposition of a term of incarceration.

Semprevivo's actions were both considered and extended. When his son e-mailed Ernst to boast of his made-up tennis prowess and express his desire to play for Georgetown, Semprevivo knew both that the goal of the scheme was to get his son admitted to Georgetown as a tennis recruit, and that Georgetown tennis coach Ernst was complicit in the scheme. *Two months* elapsed before the next significant milestone in the fraud, when Singer sent Semprevivo a proposed application

7

essay filled with similarly obvious falsehoods. During those months, Semprevivo did not reconsider his actions, back out of the fraud, or express any kind of hesitation. Instead, when offered the opportunity to recommit to the scheme in October, he doubled down—allowing the blatantly false application to be submitted in his son's name.

Semprevivo is a sophisticated businessman with an MBA from Harvard Business School and extensive experience starting and running companies. He has achieved success at the highest levels of business, amassing a sizable net worth in the process, over the course of a career spanning decades. He is neither naïve nor a pushover.

The letter submitted on Semprevivo's behalf by a psychologist is an abuse of psychological assessment to evade personal responsibility. It says that Semprevivo felt "increasingly uncomfortable" as the dimensions of the scheme became clear. It says that it was Singer who was in control, pushing Semprevivo's son "towards Georgetown, and away from Vanderbilt," and insisting that "[t]he train has left the station" when Semprevivo expressed second thoughts.

None of these self-serving contentions are supported by more than Semprevivo's say-so, and all of them are belied by undisputed facts: Semprevivo allowed his son to send the false e-mail to Ernst *months before* he allowed Singer to submit the false application on his behalf; there is no independent evidence—including in the recorded calls—that Singer pushed Semprevivo or "controlled" anything in the process beyond his own end of the fraud; and *after* submitting the Georgetown application—and even after receiving the likely letter—Semprevivo allowed his son to pursue applications to other schools, including Vanderbilt. In short, Semprevivo's description of Singer as a "bully" who pressured him into fraud is at odds with the evidence, unconvincing, and not an excuse for Semprevivo's offense.

8

Likewise, Semprevivo's contention that his poor decisions were the consequence of a "rapidly unfolding situation," in which "it was only in the days immediately preceding the submission of the application materials to Georgetown University that Mr. Singer first provided documents to [Semprevivo] containing fabricated information about [his son]," is disproven by the undisputed chronology of events. On August 10, 2015, months before the Georgetown application was due, one of Singer's employees e-mailed Semprevivo the log-in information for his son's Common Application. And when the Georgetown application was submitted two months later, on October 11, 2015, *another three months remained* before the application deadline—a period in which Semprevivo did nothing to walk back the fraud or even express misgivings about it. Semprevivo controlled the process and made the choices. He had the ability and time to take control of his son's applications, and he did. It is Semprevivo who sought out Singer, hired him, paid him, pursued the fraud for months, and authorized a lawsuit seeking to preserve the fruits of the fraud after he was caught.

Semprevivo paid Singer $400,000 to facilitate the scheme, among the largest payments by any of the 11 parents who will be sentenced by this Court. The government realizes that the Court will not include that amount in Semprevivo's offense level calculation, but the magnitude of the payment is an important starting point, and indicator, for relative culpability; a quantifiable measure, relative to other defendants, of the lengths to which Semprevivo was willing to go to obtain the fruits of fraud.

The Court should reject Semprevivo's proposal that the sanction for his offense should amount to community service with Volunteers of America of Los Angeles. Community service is admirable, but it is not a punishment; people routinely undertake this kind of volunteer service as a way of helping their communities. Allowing Semprevivo to complete community service in lieu

of incarceration would be to reward self-entitlement and privilege instead of punishing and deterring criminal conduct. *See, e.g.*, *United States v. Krutschewski*, 509 F. Supp. 1186, 1189-90 (D. Mass. 1981) ("Alternative disposition [such as community service] is often reserved for those with particular skills to offer and who do not require close supervision, which is usually unavailable. In practice this probably tends to exacerbate the discriminatory aspects of discretionary sentencing.") (denying motion for reduction of sentence).

Moreover, Semprevivo has consistently sought to deflect core responsibility for his crimes, and he continues to do so. He blames others for what he did—first Singer (when Semprevivo first grew suspicious on the telephone), then Georgetown University (when he authorized frivolous litigation to strong-arm the school victimized by his fraud), and then Singer again and his own father (when he cynically misappropriated a psychological diagnosis as a criminal excuse). Semprevivo argues that he was helpless to resist the temptation of wrongdoing. This is only a return to the point-the-finger strategy he adopted as the scheme unraveled, when Singer advised him that Georgetown was investigating his son's admission.

And his lawsuit against Georgetown is nothing short of egregious. It meets the classic definition of *chutzpah*: like the child who murders his parents and then pleads for mercy because he is an orphan, Semprevivo defrauded Georgetown, and then sought to hold Georgetown accountable (with damages) for not discovering his fraud. Semprevivo wants credit for contrition and acceptance of responsibility, but he exhibits neither.

Beyond proportional punishment for his actions, Semprevivo's persistent attempts to evade responsibility and to blame others, and his lack of remorse, highlight the need for specific as well as general deterrence in this case.

**Conclusion**

Semprevivo should be sentenced to a term of incarceration of 13 months, a fine of $95,000, 12 months of supervised release, and restitution of at least $105,341.69.[3]

                                      Respectfully submitted,

                                      ANDREW E. LELLING
                                      United States Attorney

By:    */s/ Kristen A. Kearney*
           ERIC S. ROSEN
           JUSTIN D. O'CONNELL
           LESLIE A. WRIGHT
           KRISTEN A. KEARNEY
           Assistant United States Attorneys

Date: September 19, 2019

---

[3] On September 18, 2019, Georgetown disclosed to the government that it is seeking restitution of at least $105,341.69 for legal fees accrued as of August 31, 2019 from its participation in the investigation and prosecution of this matter. *See* 18 U.S.C. § 3553A(b)(4). Those expenses continue to accrue. The government proposes to submit a proposed order of restitution within 90 days of Semprevivo's sentencing pursuant to 18 U.S.C. § 3664(d)(5), or such other time at which the Court may apportion restitution, jointly and severally, among defendants in this and related cases who are convicted of involvement in the fraud on Georgetown. *Id.* ("If the victim subsequently discovers further losses, the victim shall have 60 days after discovery of those losses in which to petition the court for an amended restitution order."); *see also Dolan v. United States*, 560 U.S. 605, 611 (2010) (concluding that the "fact that a sentencing court misses the [Mandatory Victims Restitution Act's] 90-day deadline, even through its own fault or that of the Government, does not deprive the court of the power to order restitution"); *United States v. Cheal*, 389 F.3d 35, 49-50 (1st Cir. 2004).

## CERTIFICATE OF SERVICE

      I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by CM/ECF on September 19, 2019.

                                     */s/ Kristen A. Kearney*
                                     KRISTEN A. KEARNEY