**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>Plaintiff,<br><br>v.<br><br>STEPHEN SEMPREVIVO<br>Defendant. | Cr. No. 1:19-cr-10117-IT-10 |

**SEMPREVIVO'S CLARIFICATION TO THE PRESENTENCE INVESTIGATION REPORT, SENTENCING MEMORANDUM AND REQUEST FOR ALTERNATIVE SENTENCE**
**LEAVE TO FILE DOCUMENT IN EXCESS OF PAGE NUMBER LIMIT AND TO FILE EXHIBITS UNDER SEAL GRANTED ON SEPTEMBER 20, 2019**

COMES NOW, the Defendant, Stephen Semprevivo (hereinafter Semprevivo), by and through his undersigned counsel and pursuant to U.S.S.G. §6A1.2-3, p.s., Fed. R. Crim. P. 32(d), (e)(2) and (f) and the Fifth Amendment to the United States Constitution, respectfully submits his clarifications to the Pre-sentence Investigation Report (PSR), Sentencing Memorandum, and Request for Alternative Sentence, and as grounds therefore would show;

## I. INTRODUCTION

Stephen Semprevivo was charged in a one count Information with Conspiracy to Commit Mail Fraud and Honest Services Mail Fraud 18 U.S.C. §1341, 1349, and 1346. The Information charged Semprevivo with conspiring with Rick Singer in Singer's "College Recruitment Scheme" as part of the United States "Varsity Blues" investigation. Specifically, Semprevivo hired Rick Singer, who was ostensibly engaged in the college preparation and tutoring business primarily in Southern California to assist his son in getting into an elite college.

1

Initially, Singer was hired to help Semprevivo's son prepare for the SAT exam which is a requirement for entrance to most colleges and universities. At some point in 2015, Singer, after persuading Semprevivo's son into applying to attend Georgetown, then strongly indicated to Semprevivo that his son's exceptional high school record and test scores would be borderline for admission to that school. After delivering that news, which was devastating to Semprevivo and his son, Singer indicated that he had contacts and influence at Georgetown and could positively impact Semprevivo's son's admission through a "side door." Semprevivo was informed that a "donation" to Singer's 501(c)(3) charity Key Worldwide Foundation would be used to benefit the tennis program at Georgetown and garner for his son a preferential admission through that program. Semprevivo knew that the amount requested coupled with the email and essay holding out his son as a competitive tennis player directed to Coach Ernest, were not logically related to a charitable donation. As Stephen Semprevivo noted in his letter submitted to probation, that was when he should have notified the authorities. He did not do what he knew was right and brought himself to this Court to answer for his choice.

Singer rewrote Semprevivo's son's application and essay to Georgetown, and thereafter submitted them. Singer thereafter submitted them to Georgetown which falsely held out the son as a highly competitive tennis player. Singer likewise created an email to be sent to the tennis coach, Gordie Ernst, making the same representations. Although his son was not a tennis player, Ernst designated him as a "recruit," and he was thereafter admitted to Georgetown. Subsequent to his admission, Key Worldwide invoiced Semprevivo for $400,000.00 which Semprevivo paid. At the time this payment was made, Semprevivo was unaware that Gordie Ernst had received or would receive 2.7 million dollars in compensation for his role in cooperating with Singer, for the

years 2013-2018.[1] Semprevivo verily believes that some part of the $400,000.00 paid to Key Worldwide was received by Ernst through Singer. It is also believed that Singer took part of the monies as well.

Semprevivo has pled guilty to this Information and acknowledges, with great remorse, that he knew it was wrong to go outside normal channels to help his son. As further referenced, Semprevivo's judgment at that time was impaired due to serious issues which went back to his childhood and are more fully discussed in both the Balkan report, attached as Exhibits 1(a) and 1(b)[2], and the Romanoff report attached as Exhibit 2.[3]

Pursuant to United States v. Booker, 543 U.S. 220 (2005), the Federal Sentencing process has adopted a three-step approach. (See Fed R. Crim. P. 11(m) amended December 1, 2007.) United States. V. Pugh, 515 F.3d 1179 (11th Cir. 2008)) and Amendment 741 of the Sentencing Guidelines effective November 1, 2010.

First, the Court is to resolve any disputed guideline issues and determine the advisory guideline range. In the instant case, probation has properly found under the guideline §2B1.1 no loss and no articulable victim. This results in an advisory guideline offense level of 5 with a sentencing range of 0-6 months. There is no defense objection to the guideline calculation.

Second, the Court is to consider if there are any factors that may warrant a departure from the guideline range established by probation. Probation has indicated at paragraph 141 the following;

> "U.S.S.G §5K2.0 Aggravating or mitigating circumstances: the Court may wish to consider whether the offense level determined under U.S.S.G. §2B1.1 substantially understates the significance of Semprevivo's offense and whether an upward departure is warranted under application note 21(A) to U.S.S.G. §2B1.1."

---

[1] Semprevivo was likewise unaware that Singer personally had made 27 million dollars during the decade old conspiracy.
[2] Exhibit 1(b) to be filed separately under seal.
[3] Exhibit 2 to be filed separately under seal.

For reasons more fully explored below, it is respectfully submitted that an upward departure is inappropriate. In fact, a guideline sentence at the low end of the guidelines in this matter will be reflective of the goal in sentencing set down in 18 U.S.C. 3553(a): "[determining] a reasonable but not greater than necessary sentence."

Lastly, the Court is to consider all the sentencing factors of 18 U.S.C. §3553(a) and to impose a sufficient sentence which is reasonable and not greater than necessary to achieve the sentencing objective under 18 U.S.C. §3553(a). Under these criteria, a reasonable sentence for Stephen Semprevivo would be a non-incarcerative sentence of probation.

## II.  OBJECTIONS TO PSR

### A.  Guideline Objections

There are no guideline objections to the PSR. Semprevivo concurs in the findings and computations set forth in the pre-sentence report.

### B.  Non-Guideline Objections or Clarifications

There are no non-guideline objections or clarifications to the PSR.

## III.  SENTENCING MEMORANDUM

As this court is clearly aware, since Booker, supra, District Courts are now free from the formerly mandatory nature of the Sentencing Guidelines. Stephen Semprevivo appears before this Court for sentencing after having pled guilty to an Information charging Conspiracy to Commit Mail Fraud and Honest Services Fraud. Semprevivo has accepted the guideline calculations of United States Probation and believes them to be accurate. This acquiescence to the computations of probation are wholly consistent with the Plea Agreement entered into in this case which states in pertinent part;

"Semprevivo understands that the Court is not required to follow [the stipulated guideline calculation] and that Semprevivo may not withdraw his guilty plea if Semprevivo disagrees with how the Court calculates the guidelines. If after signing this agreement, Semprevivo's criminal history score or criminal history category are reduced, the U.S. Attorney reserves the right to seek an upward departure under the guidelines."

Notwithstanding, the guideline calculation in the PSR is an offense level of 5, criminal history category 1 and an advisory guideline range of 0-6 months. The thrust of this memorandum will be to amplify why the low end of the guideline is an appropriate sentence for this first offender before the Court.

It is this Court's obligation to impose a sentence sufficient but not greater than necessary to comply with the purpose of 18 U.S.C. §3553(a). See Booker, supra; Spears v. United States, 128 S. Ct. 840 (2009); See also United States v. Ranum, 353 F. Supp. 2nd 984 (E.D. Wisc. 2005) (Adelman J. holding that "Booker was not an invitation to do business as usual.") Supreme Court decisions emphasize that District Courts have wide discretion to fashion an appropriate sentence and that Courts of Appeal will not disturb those sentences absent an abuse of discretion. Gall v. United States, 552 U.S. 35 (2007) (finding a variance to probation for a drug offender reasonable). Beckles v. United States, 137 S. Ct. 866 (2017); United States v. Madera-Ortiz, 637 F. 3d. 26 (1st Cir. 2011).

Courts are free to depart from the guidelines based solely upon reasonable disagreement with the guideline so long as the Court states its disagreement with sufficiency for the extent of the departure. Madera-Ortiz, supra; United States v. Cutler, 520 F. 3d 136 (2nd Cir. 2008).

In particular, Courts in the First Circuit have granted below guideline sentences after Booker, supra. See United States v. Goodwin, 617 Fed. Appx 126 (1st Cir. 2015); United States v. Prosperi, 686 F. 3d 32 (1st Cir. 2012); and United States v. King, 741 F.3d 305 (1st Cir. 2014).

A. The 3553 Factors Argue for a Low-End Guideline Sentence

The Courts have concluded since <u>Booker</u>, supra, that after the calculation of an accurate advisory guideline computation. The actual determination of a reasonable sentence is developed by considering those guidelines in conjunction with the factors set down in 18 U.S.C. 3553. The factors this Court must consider are as follows;

1) The nature and circumstances of the offense and the history and characteristics of Defendant;
2) The need for the sentence imposed;
   a. To reflect the seriousness of the offense, to promote respect for the law, and to promote just punishment for the offense;
   b. To protect the public from further crimes of Defendant and;
   c. To provide Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
3) The kinds of sentences available;
4) The Advisory Guideline Range;
5) Any pertinent policy statements by the Sentencing Commission;
6) The need to avoid unwarranted sentencing disparities and;
7) The need to provide restriction to any victims.

After considering all of those factors, this Court must impose a sentence sufficient <u>but not greater than necessary</u>, to comply with the purposes set forth in paragraph 2.

B. <u>The Nature and Circumstances of the Offense</u>

Semprevivo was drawn into a web of deceit created by a master manipulator, Rick Singer, years before they met. Rick Singer had been in the college counseling business for nearly a quarter of a century, most recently in an around Southern California. About 12 years ago, while centered in Newport Beach, Singer began to create what would eventually become his college racketeering enterprise in which he would gross more than 25 million dollars from victims like Stephen Semprevivo.[4]

---

[4] Singer has pled guilty to RICO, Money Laundering, Fraud, and Obstruction of Justice. Now, after his cooperation, he is awaiting sentence.

Initially, Singer only offered legitimate college counseling. In fact, it was those legitimate services that brought him into the life of Stephen Semprevivo.[5] Attached hereto and incorporated by reference herein and marked Exhibit 3 are a number of emails showing the provision of SAT preparation, tutoring provided in difficult subjects, assistance in crafting college applications and setting up trips to numerous colleges and universities around the United States to select an appropriate school for Stephen's son to matriculate at. Some of these services were in fact valuable. Semprevivo's son actually raised his SAT score in mathematics significantly. These legitimate and proper activities went on for more than a year during which time Singer developed a fiduciary relationship with Stephen Semprivivio.

Singer, through contacts cultivated through his position on various prep-school boards as well as making speeches in local prestige businesses, created an aura of respectability which drew him clients, like Semprevivo, who were seeking to put their children on the best course for success.

For Singer, parents like Stephen Semprevivo were a perfect target. Any parent obsessed with making sure their child had every chance at future success was exactly the sort of parent who could be focused to fixate unreasonably on a degree from Georgetown or Stanford. In the world of successful businessmen and professionals, many who were in fact the parents of the prep-school students in Southern California, an elite university for their child represented the Holy Grail. Once targeted, Singer drew them in, parted them from their money and made them complicit in his scheme.

Singer had hit on a scheme which, in one scenario, required him to corrupt SAT proctors and test takers to create academic credentialing, which was not reflective of a student's actual

---

[5] Singer was introduced to Semprevivo by the parents of one of his son's friends for whom Singer only provided college counseling and examination prep.

aptitude, a scenario which is not applicable here. Semprevivo's son was an "A" student at any school he had attended, a talented artist, a young man with strong extracurricular activities and an outstanding athlete, at 6'4", and he was a superb player on his high school basketball team. In fact, in the hands of a legitimate college counselor, Stephen's son would have been a prize acquisition by a huge range of fine educational institutions.

However, it was the second scenario of Singer's scheme which was to be the undoing of Semprevivo. Singer cultivated and corrupted a network of coaches and athletic administrators at a range of elite colleges in secondary sports. He concentrated on sports such as crew, tennis water polo, and soccer. Singer knew institutions were weighting the admissions process to provide preferences for recruited athletes in these secondary sports. He knew the coaches had a certain number of preferential admissions slots to use, and he intended to "buy" them from the coaches and then "sell" them to his clients by making them fear there was no other way to help their child gain admission to an elite school.

Initially, Singer's approach to Semprevivo was subtle. Despite being aware that his son was an award winning basketball player, Singer initially suggested that Semprevivo's son take up crew, a sport he never participated in and was never interested in.[6] The request came out of the blue but was memorialized in an email to Stephen, a copy of which is attached hereto, incorporated by reference herein, and marked Exhibit 4. Semprevivo's son tried it, had no interest and dropped it.  This "suggestion" evidences that Singer's intent from the beginning was to sell Semprevivo the "side door" as he had the crew coaches at Yale and Standard already providing slots for pay.[7]

---

[6] It went so far that Singer arranged to have Semprevivo's son tutored in crew.

[7] Vanddemoer at Stanford and Meredith at Yale have already entered guilty pleas.

All through the process to this point, the SAT preparation, the tutoring, the work on applications, Singer in conversations was always upbeat on Semprevivo's son's chances to pick and be accepted at a fine university.

Semprevivo and his son embarked on road trips seeing schools which Singer had indicated were possibilities for admission. Among the schools visited were the University of Michigan, Loyola, De Paul, Northwestern, Chicago, American University, Georgetown, Temple, Villanova, Babson, Vanderbilt and many others. After seeing all of these schools, Vanderbilt was Semprevivo's son's first choice. In meetings, emails, and discussions, Singer opined that Vanderbilt did not have prestige or "weight" beyond the South geographically and pushed Georgetown as a national brand.[8] However, he was without a co-conspirator at Vanderbilt, while Gordon Ernst, the Georgetown tennis coach, was on Singer's payroll where he made in excess of 2.7 million dollars selling tennis slots to Singer. A copy of checks paid by Singer to Ernst are attached hereto, incorporated by reference herein and marked Exhibit 5.

Once Singer had focused Semprevivo and his son on Georgetown, for the first time, he informed them that, in the admissions process at Georgetown, his son's formerly sterling credentials were now mediocre at best. Then, having created a problem, Singer, according to his "playbook", proposed the solution. Singer informed Semprevivo that to deal with problems like this, he had created a charity, The Key Worldwide Foundation. Key was a 501(c) (3) corporation to provide extra funding for athletic departments at some of the elite institutions to help support the financially challenged secondary sports.[9] Singer required that a $400,000 gift to Key would

---

[8] Find attached as Exhibit 6 the email from Singer to Semprevivo "comparing" Georgetown and Vanderbilt. It is clear that he is leading the Semprevivos to pick the school where had had his co-defendant.

[9] Singer contrived to maintain this fiction up to and including his controlled call to Semprevivo on 12/3/18 when he referred to the Foundation and its good works.

be used to benefit the tennis program at Georgetown. This would unlock the side door to his son's admission. At this time, Singer did not disclose his intention to have Adam masquerade as a tennis recruit.[10]

As indicated, Singer and his organization took over the application process as part of their "counseling" function. Semprevivo's son wrote his own essay and submitted it to Singer for corrections and criticism. Singer's response to Semprevivo's son was that he should email to himself and to Ernst a falsified report describing a successful summer in competitive tennis from his own email account. Only then did Semprevivo understand the full extent of the impropriety of Singer's actions and directions, and his own responsibility going forward. Semprevivo's son had provided an essay to be attached to his application. He sent it to Singer for approval. Singer rewrote it making false claims about tennis prowess and had it attached by his staff to the application.

Semprevivo felt he had been placed in a quandary to make a judgment. For many reasons, as amplified in Dr. Romanoff's report, Semprevivo did not choose wisely. By failing to stop the process, he went from only being a victim to also becoming a co-conspirator. Singer never told him that the tennis coach was being bribed and that the money was being split with Singer. Despite any rationalization on his part, Semprevivo at that point had understood that he had not acted appropriately. He realized that taking a short cut outside the normal admissions process was wrong and illegal, and his own failure to act was wrong. He was and remains deeply remorseful that he acted against his own character and has diminished himself by surrendering his integrity.

---

[10] In retrospect, Singer morphed to this approach after his earlier attempt to have his son be portrayed as a crew athlete went asunder.

However, Semprevivo feared that to disclose what he now knew would be to destroy his son's dream of studying at Georgetown. He also feared what he perceived was Singer's power and influence, would or could be used to sabotage his son's chances for acceptance at another school as well.[11]

Because Georgetown was unaware at that time that Ernst was accepting payments from Singer, they merely chose to fire him. At that time, neither of the other students had been disciplined.[12] Only after Sempevivio was involved in this scheme and was arrested in this case, Georgetown acted by expelling Semprevivo's son, a B student *ab initio* from his admission.

The crime is certainly serious. The nature and circumstances of this offense clearly show that Semprevivo knowingly broke the law permitting false emails and essays be transmitted through the mails. Clearly, some monies paid to Singer's ostensible 501(c) (3) charity went to compensate the tennis coach to get a preferred admission. Stephen Semprevivo knows he was wrong and suffers from that daily. At the same time, it is undisputed that Rick Singer prayed on Stephen, and parents like him, in his 25-million-dollar racketeering bonanza, that to some real extent makes Stephen a victim. This is analogous to a victim a victim in a Hobbs Act Extortion, where an individual pays the official acting under color of his office, motivated by the real fear that failure to do so will cost him the fair opportunity to win a contract or, as here, get admitted to a college.

---

[11] Interestingly, in 2017, a guidance counselor at Buckley Preparatory School in Los Angeles, Julie Taylor-Vaz, became aware that one of their students, being counseled privately by Rick Singer, had presented on her application to Tulane that she was an African-American tennis star. Taylor-Vaz knew the young lady who was neither African-American nor a tennis player. She so informed Tulane. Moreover, she contacted other schools this student had applied to, one of which was Georgetown, and alerted them as well. When Georgetown was informed in 2017, it immediately suspended Gordie Ernst. Further investigation established two other of Ernst's past recruits likewise were not tennis players. It is believed that one of them was Semprevivo's son.

[12] Georgetown wrote a recommendation letter for Ernst, who was able to get a new job coaching tennis at Rhode Island. These facts are documented in the September 2019 article by Evgenia Peretz in Vanity Fair; *To Cheat and Lie in L.A.: How the College-Admissions Scandal Ensnared the Richest Families in Southern California.* *https://www.vanityfair.com/style/2019/07/to-cheat-and-lie-in-la-college-admissions-scandal*

C. <u>Personal and Family History</u>

The personal and family history are documented in great length in the Report of Dr. Sheila Balkan attached as Exhibit 1(a) and 1(b). Likewise, a full and complete psychological assessment was performed by Dr. Richard Romanoff and is attached as Exhibit 2. Rather than restate the extraordinary background and accomplishments of Stephen Semprevivo or restate the underlying psychological issues that contributed to impacting his judgment in his dealings with Rick Singer, the legal significance of the history and issues will be the focus of this section.

**1. <u>Stephen Semprevivo's Extraordinary Family Ties and Responsibilities</u>**

Effective October 27, 2003, the Sentencing Commission amended 5H1.6 to limit the availability of departures for family ties and responsibilities. A new application note §5H1.6 comment (n. 1(A)(I)(III)) instructs the Court to consider the seriousness of the offense, Semprevivo's involvement in the offense, and the effect on members of the Semprevivo family. Further, comment (n. 1(B)(I)-IV) requires the Court to consider if;

> "<u>Defendant's service of a sentence within a guideline range will cause a substantial loss of essential care taking or essential financial support for the family.</u>" that "<u>the loss of care taking or financial support is on in which no effective remedial or ameliorative programs are reasonably available</u>" and that "<u>the departure will effectively address the loss of care taking or financial support.</u>"

In this matter, the guidelines call for a sentence between 0-6 months. We have requested probation. While Semprevivo clearly participated in the offense, he was a "mark" targeted by a master scammer to fuel his scheme to short cut the admissions process at elite schools as a money-making opportunity for himself and the college employees he could corrupt. Finally, Semprevivo's family ties and responsibility are by any definition extraordinary. Although family ties and responsibilities are available as a downward departure under 5H1.6, Mr. Semprevivo

asks this Court to consider it a sentencing factor under 18 U.S.C. §3553 in determining a reasonable but not greater than necessary sentence.

Obviously, the sentencing landscape has been constantly evolving since the Supreme Court's decisions in <u>Booker</u>, supra and <u>United States v. Fanfan,</u> 558 F.3d 105 (1st Cir. 2009).

Stephen is exceptionally close with both his sons, Adam and Jordan. Jordan has had serious physical problems which began in his sophomore year in high school consisting of inflammation of his limbs and a severely limited range of motion. During the same time frame as Jordan's physical problems, Adam began to develop serious problems with depression and a loss of self-image. As reflected in Dr. Balkan's report, Stephen was always rock solid in dealing with the challenges faced by both his boys. He guided Adam, who was in therapy and provided tremendous emotional support to Jordan.

Jordan's problem became exacerbated and in his second year of college, he developed painful stomach ulcers which evolved into dyspepsia. Over 6 feet tall, as a result of these medical issues, his weight dropped to around 100 pounds. Fearing the worst, Stephen and his wife, Rita, took their son to Mayo Clinic to address the medical issues. Yet, as pointed out by Dr. Balkan, the mere presence of his father is the constant he has held onto to spur a recovery. Losing his father to incarceration would negatively impact his recovery.

In addition to caring for his own nuclear family, Stephen has been a surrogate parent for his extended family as well. Sharing his financial success with his and his wife, Rita's, siblings' ten children, he has gifted them with college tuitions funds, which he created for all their nieces and nephews. As can be clearly seen, incarcerating Semprevivo would deal a serious blow to the emotional and economic stability of his entire extended family.

This Court should consider a sentence at the low end of the guideline or probation which enables Semprevivo to remain the financial and emotional bedrock of his family. To do otherwise would cause a substantial loss of essential care taking and essential financial support of the family. This sort of loss of care taking and emotional support exceeds the normal harm visited on an individual and his family by virtue of an incarceration. It is exacerbated here by its lack of necessity where Semprevivo fits into a guideline (0-6 months) where Congress and the sentencing commission have effectively opined that justice is and can be served by a non-incarcerative sentence in normal course. As a result, to incarcerate Stephen Semprevivo would be to do so only to visit an unnecessary and non-mandated harm on his family.

Variances and departures have been granted in similar cases by numerous District Courts and have been upheld by Circuit Courts on appeal. In United States v. Bueno, 549 F3d 1186 (8th Cir. 2008), the Court found a downward departure appropriate where Defendant's wife was suffering from various life-threatening diseases, which rendered Defendant's care taking irreplaceable and indispensable to the well-being of his wife and to her caregiving regimen.

In United State v. Prosperi, supra, the Court affirmed a departure based on serious family circumstances, writing

> "…the circumstances of Prosperi's family are atypical and powerful, both in justifying a variance and in the home confinement actually chosen. At the time of sentencing, Prosperi's wife was battling terminal cancer. She submitted a letter to the District Court stating that, 'I depend of my husband for almost everything. He is my caregiver, my love, and is irreplaceable. I need him by my side."

It is also of note that the case in which the variance was approved was a white-collar criminal offense with a multi-million-dollar loss suffered by multiple victims. See also United States v. Menyweather, 447 F.3d 625 (9th Cir. 2006).

In this case, it is clear and compelling. Although not as life threatening in the cited cases, the challenges faced by the Semprevivo family are quite serious, and Stephens's presence is needed to carry his sons, in particular through very difficult times. The caregiving and structure provided by Stephen Semprevivo cannot be replaced. A sentence of probation permissible under the guideline range is warranted.

    2.   <u>Stephen Semprevivo's Charitable Works and Service to the Community</u>

This Court has received in Dr. Balkan's Report dozens of letters from members of the community where Stephen Semprevivo lives and interacts attesting to his extraordinary acts of not only charitable generosity, but of personal hands on activities which illuminate his constant desire to make the world a better place by helping those in need.

Stephen began putting himself out for others as early as his college days when he volunteered in the "Big Brother" program. He was proud even then of assisting a 13-year-old boy being raised by a single mother spending time with and mentoring to give him a path to success. (Balkan Report p. 29).

During that same time frame, Semprevivo worked as an unpaid intern at Einstein Medical Center where he helped advance research into diseases of the liver.

Subsequent to graduation, he acted as a volunteer in the Bay area where he was starting his own career, teaching word processing in an Adult Education class. Stephen volunteered at least once a week for nearly two years to help others transition into productive careers. Stephen knew early in life that giving back and doing for others in the end benefits everybody. He also instinctively knew that service to others by actually doing it yourself is more meaningful than passively writing a check and letting someone else do the hard work.

With a young family, Stephen encouraged his sons to participate in sports, but again recognized that, though it was nice to cheer from the stands, it was certainly more important to proactively coach his own child and the children of others, and inculcating in all of them the values of commitment to excellence, the pride of hard work and accomplishment, the value of being part of a team, and the essential rewards of fair play and good sportsmanship.

To that end, Stephen coached baseball, basketball, and soccer virtually year around. As Dr. Balkan recounted from Flint Dille, an adjunct professor at U.S.C., "Stephen was always good with the kids. I never once heard him raise his voice, show any temper or do anything but be a calm supportive coach." Attached hereto and incorporated by reference herein are just some of the literally scores of youth teams in Los Angeles coached by Semprevivo. Marked Exhibit 7, it graphically shows the commitment and effort expended by Semprevivo in working for his community.

Stephen, during this time frame, not only devoted hours per week coaching children, he also continued to teach his own children by example; donating and volunteering for the St. Vincent Meals on Wheels program to provide for the less fortunate particularly during holiday season every year.

Stephen was ever conscious of the need to always give back to society. In 2006, with the aid of his wife Rita, they put together a "Reading Buddies" program at Warner Avenue Elementary. The aim was to assist children in being more literate, and the program did just that benefitting all who participated.

With Adam, during his high school years, Stephen joined his son in "Tree People," which was a program dedicated to aiding the environment by actively planting trees, plants and shrubs

while removing toxic invasive species. With Stephen and his family, the motto was always that of service to others. The list of their jointly taken endeavors is too numerous to fully recount.

Presently, Stephen is volunteering nearly 20 hours a week at Volunteers of America Los Angeles, whose mission is to serve the poor and needy. Stephen is providing hands on administrative and planning service to greatly expand the reach and effect of this charity. Again, the Balkan Report, at page 31, begins to give a full description of this most important charitable endeavor.

Not only has Stephen spent a lifetime being generous with his time, but his financial contributions to numerous charities and fundraisers likewise show that in support of his community. Semprevivo has given financial contributions to the following charities since 2012; Georgetown Scholarship Fund, University of Pennsylvania General Fund, Harvard General Fund, Nancy Painter Home for Mothers, St. Vincent's Meals on Wheels, Campbell Hall High School, Association for the Blind, The Buckley School, St. Martin Tours Church, Goodwill Rescue Mission, City of Hope, Parent's Against Leukemia, KW Cares, Make a Wish Foundation, Pediatric Cancers Research Foundation.  Stephen Semprevivo is always a man who can be counted on.[13]

In United States v. Cooper, 394 F.3d 172 (3rd Cir. 2005), a securities and tax evasion case with a sentencing range of 15-21 months, a four level departure was warranted for a defendant's exceptional good works where he did not simply donate money to charity, but also organized and ran a youth football team in a distressed area, mentored its members and helped several of them finish high school and get into college. This was treated as exceptional by the Court; "…hands-

---

[13] To be clear, Semprevivo is requesting a low end of the 0-6-month guideline established by the PSR in this case. The cases that follow speak of downward departure and variances. They are cited as the closest analogy to support the low-end guideline being most appropriate in this case.

on personal sacrifices which have a dramatic and positive effect of the lives of others is [exceptional]."[14]

In <u>United States v. Serafini</u>, 233 F.3d 758 (3rd Cir. 2000), the community service and charitable works performed by the Defendant, a state legislator convicted on perjury in a Federal Grand Jury investigation were extraordinary and exceptional so as to justify a 3-level downward adjustment for community service and good works. Here, the legislator provided large financial guarantees for medical treatment of a terminally ill patient while also mentoring a seriously injured college student. See also <u>United States v. Wood,</u> 159 f.3D 1132 (8th Cir, 1998); <u>United States v. Jones</u>, 158 F3d 492 (10th Cir. 1998); <u>United States v. Crouse</u>, 143 F.3d 786 (6th Cir. 1998).

There is a cogent rationale for recognizing and rewarding good works. Judge Jed Rakoff in the Southern District of New York in <u>United States v. Adelson</u>, 441 F. Supp. 506, 511 (SDNY 2006) explained the importance of a defendant's good works and the support of his community at sentencing as it relates to a sentencing matters. The Court reflected on the numerous letters it had received from people in "in all walks of life" attesting to Adelson's good works and deep humanity. Writers described his generosity of spirit and his ever-present willingness to go above and beyond the call of duty to help others. 441 F. Supp. 2nd 513. The Court further referenced the numerous colleagues, professionals and public officials who wrote to the Court to express their admiration for the Defendant.

> But surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing when his very future hangs in the balance. This elementary principle of weighing the good with the bad, which is basic to all the great religious, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'

---

[14] This is the same sort of hands on personal sacrifice reflected in Semprivivo's entire life.

See also <u>United States. Tomko</u>, 562 F.3d 558, 572 (3rd Cir. 2009) (en banc) upholding probation sentence with home confinement in a tax case and commenting on support form letters written on defendant's behalf, demonstrating his community ties and extensive charitable works, <u>United States v. Thurston</u>, 544 F.3d 22 (1st Cir. 2008).

<u>Thurston</u>, a case out of this Circuit, is particularly illuminating. The Government appealed a downward departure based largely on good works and community service. The 1st Circuit affirmed a three-month sentence given the Defendant in a 5 million-dollar Medicare fraud. The Court commented that the District Court's assessment and decision to vary was ably supported by Defendant's "charitable work, community service, generosity with time and spiritual support and assistance to others."

In sum, it is submitted that his long history of community service, his work with disadvantaged children, his efforts to feed and educate the poor and disadvantaged, and his current work with Volunteers of America is truly exceptional and may be considered by the Court as a variance or a basis upon which to sentence Defendant to the lowest end of his guideline: probation.

D.  <u>Adequate Deterrence in General</u>

It is obviously one of the sentencing objectives under 18 U.S.C. §3553 is to deter a Defendant as well as others who might engage in similar conduct from committing these offenses. These objectives are enunciated in §3553(a)(2) the need for the sentence imposed. It must reflect the seriousness of the offense, afford adequate deterrence and protect the public from future crimes of the Defendant.

We have dealt at some length with the nature of the offense, which constitutes a serious crime, and which is reflected in the offense level set by the sentencing commission. The balance then is one which concern deterrence and protection of the public. Both issues will be addressed.

    1. <u>Deterrence</u>

It is the position of the Defendant that punishment or incarceration in this case would have a negligible deterrent effect either on Semprevivo or on others similarly situated. In order to fully appreciate this, one needs only to look at a recent study by the United States Department of Justice. Published by the National Institute of Justice, "Five Things about Deterrence" filed June 26, 2015; it states:

    "1. <u>The certainty of being caught is a vastly more powerful deterrent than the punishment.</u>
Research shows clearly if criminals think there is only a slim chance they will be caught, the severity of the punishment, even a draconian punishment – is an ineffective deterrent to crime.

    2. <u>Sending an offender to prison isn't a very effective way to deter crime.</u>
Prisons are good for punishing criminals and keeping them off the street, but prison sentences are unlikely to deter future crime. Prison may actually have the opposite effect: Inmates learn effective crime strategies from each other, and time spent in prison may desensitize many to the threat of future punishment.

    3. <u>Police deter crime by increasing the perception that criminals will be caught and punished.</u>
The police deter crime when they do things that strengthen a criminal's perception of the certainty of being caught. Strategies that use the police such as "hot spots" policing, are particularly effective.

    4. <u>Increasing the severity of punishment does little to deter crime.</u>
Laws and policies designed to deter crime by focusing mainly on increasing the severity of punishment are ineffective partly because criminals know little about the sanctions for specific crimes. Seeing a police officer with handcuffs and a radio is more likely to influence a criminal's behavior than passing new laws increasing punishment.

    5. <u>(inapplicable; deals with capital punishment)</u>

This D.O.J. publication speaks primarily to general deterrence, i.e. the deterrence of others, however, it does not directly address deterrence of the individual nor does it address the concept of recidivism. Both are addressed in this memorandum. However, it is clear that a reliance on the §3553 concept of general deterrence would not be applicable in a case such as this, if for no other reason the population to which it is addressed is relatively sophisticated and from the massive fallout and publicity that attended the arrests and prosecutions in this matter would be loath to commit a similar crime.

2. Stephen Semprevivo has already been punished in this case and there is no need for further deterrence.

Despite the numerous letters written on Semprevivo's behalf, and despite his extraordinary history of community service, good deeds, and assisting the less fortunate, he is quite aware that this Court has in its power the ability to incarcerate him, take him away from his extended family which sorely needs him and exacerbates the considerable punishment he has already received. He was aware of the consequences when charged, when he plead guilty, and is aware of them as he awaits the ultimate and final judgment of this court.

Semprevivo has already been punished socially, professionally, economically and publicly because of his involvement in this case. First, it might be surprising to state, since this Court has received a plethora of letters written on behalf of Semprevivo, but like many in the public eye, many associations, organizations, friends, former colleagues, former employees and others have deserted Semprevivo and his family. He has been fired by his employer who was responsible for his income, and he has been unable to find a position in his field of specialty where he was considered an expert prior to his arrest. Attached hereto, incorporated by reference herein and marked Exhibit 8 is the email received terminating his employment as a result of his arrest.

Additionally, long standing banking relationships have been terminated by financial institutions where Semprevivo has had his checking and saving accounts. Credit cards issued by this bank have been cancelled and balances accelerated all as a result of this case. The correspondence from Chase closing accounts and terminating the relationship is attached hereto, incorporated by reference herein and marked Exhibit 9.

Semprevivo has personally withdrawn from social and professional organizations in which he had previously participated not only as a result of his embarrassment but as a result of his not wanting to place his former associates in an uncomfortable position.

As a result of this conviction, Semprevivo's future prospects are dim or at best uncertain. He is presently unemployed and for the time being unemployable in his field which requires him to have a reputation for honesty, probity, and trustworthiness which he completely lacks in the perception of his potential client base. To date, as a result of his arrest, his actual losses are in the millions of dollars. Attached hereto, incorporated by reference herein and marked Exhibit 10 is an accounting cataloging his losses which include; a) attorney's fees; b)contribution to Key Worldwide; c) estimated guideline fine; d) additional taxes to be paid as a result of Key "contribution;" e) tutoring payments; f) college payments lost as a result of sons expulsion; g) loss of salary.

Additionally, monies to pay for the losses occasioned by this matter have resulted, with penalties for early withdrawal, in a multi-million diminution of the value in Defendant's and his wife's retirement accounts. A chart identifying said loss is attached hereto, incorporated by reference herein and marked Exhibit 11.

As demonstrated in the charts establishing the exceptional financial losses suffered by Semprevivo as a result of his involvement with Singer, prominent among them are the tax

consequences. Semprevivo, as noted, made a directed payment or "donation" to Key Worldwide, Singer's 501(c)(3) corporation. Key Worldwide was allegedly a charity which included among its "beneficiaries" the athletic departments at elite colleges which supported secondary sports, such as tennis. Semprevivo, subsequent to his son's admission to Georgetown, made a $400,000 payment to Key Worldwide. A copy of Semprevivo's check to Key Worldwide is attached hereto, incorporated by reference herein and marked Exhibit 12.

As a result of the filing of this case and its attendant arrest, it became incumbent upon Semprevivo to resolve the tax problem created by his deduction of the $400,000 payment to Key as a charitable contribution. Moreover, as part of his plea agreement in this case, he agreed to cooperate with the Internal Revenue Service to resolve the tax problem. Semprevivo has, in fact, filed amended returns with the IRS for the tax years 2015 and 2017. A copy of the amended returns are attached hereto, incorporated by reference herein and marked Exhibit 13. Funds to pay the corrected taxes are in Semprevivo's counsel's Trust Account and are in the sum of $134,158.88 as determined by Semprevivo's CPA in compiling the Amended Returns. The IRS has completed its own computation and has confirmed these amounts are to be paid.

Additionally, Semprevivo filed Amended California returns for the same time period. He was invoiced by the state for the back taxes and made full payments. A copy of Semprevivo's counsel's electronic transfers of funds to the State of California are attached hereto, incorporated by reference herein and marked Exhibit 14.

Finally, a 10-year period projection of his future earnings were prepared by Richard Malone who is a retired International Revenue Service Enforcement Agent. This chart, which is attached hereto, incorporated by reference herein and marked Exhibit 15, projects a loss of

income in excess of five million dollars. Economically, Defendant's punishment is already draconian.

Media attacks on Semprevivo and his family have been extensive and, in many cases, vicious. Local and national print, broadcast, and digital media have negatively and incessantly portrayed him as a liar and cheat. The drum beat of outrage has been pervasive and humiliating. Not detracting from the fact that he has committed a crime and pled guilty, the "public tar and feathering" of Semprevivo and the other parents involved in his offense has gone beyond cruel and unusual.

Semprevivo is well aware that in fashioning a reasonable but not greater than necessary sentence in his case, the Court must consider all 18 U.S.C. §3553 factors. The nature and seriousness of the offense is evident as is Defendant's remorse. He pled guilty and has fully accepted his responsibility for the disastrous mistake which has uprooted his life.

The Court likewise must consider the history and characteristics of the Defendant. To that end, Semprevivo asks the Court to consider he is now 53 years old. He was never arrested before, and he will never be again. He has been married to his wife, Rita, nearly 23 years and together they have been through much. Now they face the possibility of a forced separation and the prospect of unemployment and ostracization from friends and associates. If that is not enough, they face the prospect of dealing with the physical and emotional problems for their children, brought on in part by Semprevivo's bad choices in this case. Stephen Semprevivo, however, is much more than a husband and father. He is much more than an incredibly talented businessman and consultant who has been recognized at top of his profession for many years. Stephen Semprevivo has truly, year after year, one person at a time, through his years of

community services and charity, improved the lives of so many. Just as in the <u>Copper</u> decision, Semprevivo never simply donated money to charity, he changed lives for the better.

E. <u>Semprevivo is not likely to reoffend.</u>

In considering recidivism, the Court should strongly consider Mr. Semprevivo's age and criminal history category. In the U.S. Sent'g Comm'n, *Recidivism Among Federal Offenders: A Comprehensive Overview* at pp. 18, 23 (March 2016) (reflecting a statistical decrease of the likelihood of recidivism as offender's age increases, specifically showing that offenders over the age of 60 at the time of sentencing with a Category I criminal history are the most unlikely to reoffend), which is available on the Commission's site at https://www.ussc.gov/research/research-reports/recidivism-among-federal-offenders-comprehensive-overview (last visited February 11, 2018). Semprevivo is presently 53 years old and clearly fits into the age category of offenders with the lowest rates of reoffending.

The Commission found that "[s]tudies have repeatedly shown that older offenders at sentencing are at lower risk for reoffending, and that Commission's research confirms these finding." *Id.* at *56. The Commission's study states that "[a]ge at release also is associated with different rates of recidivism. Those released into the community…over sixty years old, had the lowest recidivism rate, 16.0 percent." *Id.*

Accordingly, in imposing the least sentence sufficient to account for the need to protect the public from further crimes of Mr. Semprevivo this Court should consider the statistically low risk of recidivism presented by his history and characteristics. *See, e.g.* <u>United States v. Holt</u>, 486 F.3d 997, 1004 (7th Cir. 2007) (affirming below-guideline sentence based on defendant's age, which made it unlikely that he would again be involved in a crime).

In the recent opinion of the Seventh Circuit Court of Appeals authored by Judge Posner, that Court held, forcefully, on the deterrent prong of §3553(a) (<u>United States v. Pressley</u>, 730 F3d 699 (7th Cir 2015)). Judge Posner writing for the unanimous panel said,

> "A sentence long enough to keep the Defendant in prison until he enters the age range at which the type of criminal activity in which he has engaged is rare and should achieve the aims of …specific deterrence, while lengthening the sentence is unlikely to increase general deterrence significantly if the persons engaged in the criminal activity for which the Defendant is being sentenced have a high discount rate; for beyond a point reached by not a very long sentence, such persons tend not to react to increases in sentence length by abandoning their criminal careers."

What Judge Posner was in effect simply saying was that criminals do not read other people's sentences, and if they do, "The length of a sentence has less effect on such a person than the likelihood that he'll be caught, convicted, and imprisoned." Citing A. Mitchell Polansky and Steven

Shavell "On the Disutility and Discounting of Imprisonment and the Theory of Deterrence", 28 J. Legal Studies 1, 4-6 (1999). Therefore, this incident is unlikely to be repeated by Semprevivo.

F. <u>Kind of Sentences Available and Sentencing Request</u>

A term of probation or its equivalent of home confinement as a condition of probation coupled with community service of 2,000 hours at Volunteers of America Los Angeles would allow Stephen Semprevivo to continue serving his fellow, less fortunate citizens offering those special skills at organization, administration, and innovation which defined him prior to committing this act which brought him to this day.[15]

Courts have agreed, even before <u>Booker,</u> supra, that the imposition of a probationary sentence is warranted in cases where the guidelines range was substantially higher than in his

---

[15] See letter from Bob Pratt, President of Volunteers of America, Los Angeles, attached hereto, incorporated by reference herein and marked Exhibit 16.

case. See <u>United States v. White Buffalo</u>, 10 F.3d. 575, 577-78 (8th Cir. 1993) (guideline range 18-26); <u>United States v. One Star</u>, 9 F.3d. 60, 61-62 (8th Cir. 1993) (guideline range was 33-41 months); <u>United States v. Scalmo</u>, 997 F2d. 970, 972 (1st Cir. 1999) (guideline range was 24-30 months).

While a probationary sentence may be less severe than jail time, it is still a significant punishment as well as a severe restrain on liberty and freedom. It is also important to note in this case, no matter what punishment is chosen by this Court, the collateral consequences outlined earlier are real, severe and irreversible. The Supreme Court explain in <u>Gall</u>, supra;

> "Custodial sentences are qualitatively more severe than probationary sentences of equivalent terms. Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty…probationers may not leave the judicial district, move or change jobs without notifying and in some cases receiving permission from their probation officers or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony and refrain from excessive drinking…most probationer are also subject to special conditions imposed by the Court. Gall, for instance, may not patronize any institutions that receives more than 50% of its revenue from the sale of alcohol, and must submit to random drug tests as directed by his probation officer."

<u>Gall</u>, 552, U.S. 38, 48 (2002).

Indeed, Courts around the country, post <u>Booker</u>, have crafted probationary sentences as variances for first time, non-violent offenders. They have done so particularly in cases where it is clear that the Defendant will not reoffend and can positively contribute to society. <u>United States v. Tomko</u>, supra. As was held by the Court in <u>Coughlin</u>, supra:

> "Home detention and probation can be severe punishment…hugely restrictive of liberty, highly effective in determent of crime and amply retributive.

In this case, Stephen Semprevivo has a guideline range of 0-6 months, requesting the low end of that guideline is consistent with the multitude of precedents cited herein. All of the sentencing factors in 18 U.S.C §3553(a) are as compelling or more compelling than those cited

in the referenced cases. A non-incarcerative sentence for this otherwise kind, generous, productive and decent human being would certainly be appropriate.

## **<u>CONCLUSION</u>**

WHEREFORE, the Defendant prays this Court consider the matters set forth in this memorandum, attachments and exhibits and impose and sentence Stephen Semprevivo to a period of probation with a special condition of community service.

Respectfully Submitted,

By his attorney,
*/s/ David Kenner*
David E. Kenner, Esq.
Bar Number: 41425

Kenner Law Firm
16633 Ventura Blvd., Suite 1212
Encino, CA 91436
Phone: (818) 995-1195
Fax: (818) 475-5369
Email: david@kennerlawfirm.com

*/s Alvin E. Entin*
ALVIN E. ENTIN, ESQ.
Fla. Bar No: 127027
E-mail: aentin@hotmail.com

ENTIN LAW GROUP, P.A
633 S. Andrews Avenue, Suite 500
Ft. Lauderdale, Florida 33301
Tel: (954) 761-7201 | Fax: (954) 764-2443

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 20th day of September, 2019, I electronically filed the foregoing document with the Clerk of Court using CM/ECF, and that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive Notices of Electronic Filing.

*/s/ David Kenner*
DAVID KENNER, ESQ.