IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

```
* * * * * * * * * * * * *     19CR10117-IT-10
UNITED STATES OF AMERICA*
                        *
VS.                     *     SEPTEMBER 26, 2019
                        *     11:00 A.M.
STEPHEN SEMPREVIVO      *
                        *
* * * * * * * * * * * * *     BOSTON, MA
```

BEFORE THE HONORABLE INDIRA TALWANI

DISTRICT JUDGE

(Sentencing)

**APPEARANCES**:

```
FOR THE GOVERNMENT:     KRISTEN A. KEARNEY, AUSA
                        ERIC S. ROSEN, AUSA
                        U.S. Attorney's Office
                        1 Courthouse Way
                        Suite 9200
                        Boston, MA 02210

FOR THE DEFENDANT:      DAVID E. KENNER, ESQ.
                        Kenner and Greenfield
                        16633 Ventura Blvd.
                        Encino, CA  91436

                        ALVIN E. ENTIN, ESQ.
                        Entin Law Group, P.A.
                        633 South Andrews Avenue
                        Suite 500
                        Fort Lauderdale, FL  33301

                        STEVEN C. BOOZANG, ESQ.
                        Steven C. Boozang, Esq.
                        439 Washington Street
                        Dedham, MA  02026

Court Reporter:         Debra D. Lajoie, RPR-FCRR-CRI-RMR
                        1 Courthouse Way
                        Boston, MA  02210
```

Proceeding reported and produced
by computer-aided stenography

1    26 SEPTEMBER 2019 -- 11:00 A.M.

2           THE CLERK:  United States District Court is now

3    in session, the Honorable Judge Indira Talwani

4    presiding.  This is Case No. 19CR10117, the

5    United States v. Stephen Semprevivo.

6           Will counsel please identify themselves for

7    record.

8           MS. KEARNEY:  Good morning, Your Honor.

9    Kristen Kearney and Eric Rosen for the Government.

10           THE COURT:  Good morning.

11           MR. KENNER:  Good morning, Your Honor.

12    David Kenner, Alvin Entin and Steve Boozang for

13    Mr. Semprevivo.

14           THE COURT:  Good morning.

15           We are here for sentencing, and I will go

16    through first the documents that I have received and

17    reviewed.  I have the presentence report.  It was

18    prepared on August 7th and revised on September 4th.  I

19    do not have a sentencing recommendation from the

20    Probation Office per the Government's objection.

21           I have the Government's memorandum regarding

22    methodology for calculating gain or loss under the

23    guidelines, that was Docket 420 and amended at 422;

24    Probation's submission in response to my order that was

25    for 40, and all of that was addressed in my memorandum

1    and order.  That's Docket 443.

2         I have reviewed the Government's sentencing

3    memorandum as to all Defendants, that's 423, was filed

4    September 6; and an additional sentencing memorandum

5    as to Mr. Semprevivo, that's Document 466 filed

6    September 19; Defendant's sentencing memorandum, as

7    filed at Docket 469.  I believe it was first filed at

8    467.  I haven't reviewed the difference between the two

9    documents, if any.  So I have reviewed 469 after I

10   granted leave for excess pages and Exhibits 1 through

11   16, including the sealed unredacted Exhibits as 1A, 1B

12   and 2B.  And I have a victim-impact statement from

13   Georgetown that was dated August 2nd.

14        To my knowledge, there is no other material that

15   has been submitted by the parties to the Court; is that

16   correct?

17        MR. KENNER:  Yes, Your Honor.

18        MS. KEARNEY:  Your Honor, after the submission

19   of the Government's sentencing memo, we did receive a

20   breakdown of the restitution requests from Georgetown,

21   which we did properly provide to Probation and to

22   defense counsel.

23        THE COURT:  Okay.  I haven't received that.

24        MS. KEARNEY:  May I provide it now?

25        THE COURT:  I'll look at it.

1          And this was submitted to you on September 18;

2     is that correct?

3          MS. KEARNEY:  Yes, Your Honor.

4          THE COURT:  So just so that the Government,

5     since you're a repeat player here, if you could

6     understand what information I do and don't receive from

7     Probation, it might help in sentencings.

8          When the Probation Officer provides the initial

9     presentence report to the parties, I don't get a copy

10    at that time.  When you file your objections, I don't

11    get the copy of those written objections.  What I get

12    is what you see, that final presentence report that

13    gets to you, that's what I see.

14         I can thereafter make requests to the Probation

15    Officer for anything else, but I don't -- simply

16    because you hand something to the Probation Officer

17    doesn't satisfy getting in front of me, and part of

18    that is because there's a procedure for what I have and

19    what documents I have and what are part of the record.

20    And when the Government or a party thinks that I have

21    all of this other material that isn't part of a Court

22    record, it sort of misunderstands the process.

23         So I did not see this.  Your giving it to

24    Probation means it was available for me to request from

25    Probation, but I don't think I even knew that you gave

1   it to Probation.  You did mention that you had received

2   it on the 18th.  But, at any rate, if you're looking to

3   file something for my attention in advance of a

4   sentencing, the way to do it is a motion for leave to

5   file something.

6           MS. KEARNEY:  Yes, Your Honor.

7           THE COURT:  Thank you.

8           MR. KENNER:  Your Honor?

9           THE COURT:  Yes.

10          MR. KENNER:  I have previously handed your Clerk

11  a couple of documents.  One is a document from

12  Volunteers of America/Upward Bound.  This is a more

13  readable copy of Attachment 2 to Exhibit 16, which is

14  the information and material from Volunteers of

15  America.  When reviewing it, I found it a little

16  difficult to read, so I provided you with a clearer

17  copy.

18          THE COURT:  Okay.  I was just handed three

19  pieces of paper, so tell me what the three pieces of

20  paper -- one is --

21          MR. KENNER:  There's --

22          THE COURT:  Hold on a minute.  One is a clearer

23  copy of Attachment --

24          MR. KENNER:  2, which follows the letter from

25  Bob Pratt in Exhibit 15 -- I'm sorry -- Exhibit 16.  I

1    apologize.

2            THE COURT:  Exhibit 16 is 467 --

3            MR. KENNER:  The materials from Volunteers of

4    America, Your Honor.

5            THE COURT:  Okay.  And --

6            MR. KENNER:  And you will notice there is an

7    Attachment 2.

8            THE COURT:  Yes.  So it's a 32-page document.

9    I'm just trying to figure out which page you're

10   replacing of the 32 pages.

11           MR. KENNER:  It would be the fifth page,

12   Your Honor.  At the top it reads, "Attachment 2" and

13   "Upward Bound."

14           THE COURT:  Yes, it is far more legible than

15   that one, and the Clerk will replace -- it's Document

16   467-17, Page 8 of 32, and if you could replace it with

17   this page, that would be great.

18           MR. KENNER:  Thank you.

19           THE COURT:  What else?  And the other two are

20   what?

21           MR. KENNER:  There is one document that

22   Mr. Semprevivo received just reflecting that the

23   insurance company, as a result of this case, is not

24   willing to renew his insurance.

25           THE COURT:  So that's a new document?

1          MR. KENNER:  Yes.

2          THE COURT:  Okay.

3          MR. KENNER:  And the other new document,

4    Your Honor, is a declaration from Attorney Mark Zade,

5    declaration dated September 24th, 2019.  He was local

6    counsel in the lawsuit where Adam Semprevivo sued

7    Georgetown.  And I've given a copy of that to the

8    Government, both of those documents.

9          THE COURT:  So with regard to the -- well, let

10   me break these down in two separate pieces.  If the

11   notice of non-renewal of insurance the Clerk could add

12   to the docket as an additional filing by the

13   Defendants.

14         The restitution calculation, I assume the victim

15   would want that filed under seal, as would be

16   appropriate for these things, but that can be added to

17   the docket as a sealed document.

18         With regard to this further declaration, I think

19   we may want to wait until we get to the discussion

20   about that --

21         MR. KENNER:  Certainly.

22         THE COURT:  -- filing of the lawsuit.  This

23   raises questions, I would imagine, that whatever

24   happened there in those negotiations are probably

25   considered by the parties to the negotiation

confidential.  I understand the reasons why you would want to put this in there in light of the allegations made by the Government, but until we address how to deal with those allegations of the Government, we don't know that we want to add this to the docket at this point.

MR. KENNER:  Okay.  Thank you, Your Honor.

THE COURT:  So, with that, anything further?

MS. KEARNEY:  No, Your Honor.

MR. KENNER:  No, Your Honor.

THE COURT:  And Ms. Kearney, do you have any witnesses or victims present who plan to make any statements?

MS. KEARNEY:  No, Your Honor.

THE COURT:  Thank you.

And for defense counsel, have you had an opportunity to review all the materials submitted in connection with the sentencing?

MR. KENNER:  Yes, Your Honor.

THE COURT:  Have you gone over it with the Defendant?

MR. KENNER:  Yes, Your Honor.

THE COURT:  Mr. Semprevivo, have you reviewed all the material?

THE DEFENDANT:  Yes, Your Honor.

1          THE COURT:  And have you had a chance to discuss

2    it with your counsel?

3          THE DEFENDANT:  Yes, Your Honor.

4          THE COURT:  And to counsel, also, were you

5    expecting any evidentiary hearing?

6          MR. KENNER:  I do have several people

7    that I would like to address the Court.  One is

8    Andrew Chambers.  He has submitted a letter.  He is a

9    former FBI Agent, co-head of the Anti-Terrorism Task

10   Force in Los Angeles as his last position.  He's known

11   Mr. Semprevivo for 15 years and has flown from

12   California to briefly address Your Honor.

13         The other is Mr. Bob Pratt who is the President

14   and CEO of Volunteers of America Los Angeles with whom

15   Mr. Semprevivo has already been working since I believe

16   May of this year and who has flown here on a red eye to

17   be able to address Your Honor briefly.

18         THE COURT:  Okay.  Thank you.

19         So let's go to the objections to the presentence

20   report.  Government Objections 1 through 9 I believe

21   were addressed in my earlier memorandum.

22         Is there anything further, understanding that

23   you are maintaining that objection?

24         MS. KEARNEY:  Just that we would want it noted

25   for the record.

1          THE COURT:  Thank you.

2          So I am overruling those objections, as per my

3   memorandum.

4          Objection 10 is restitution.  So the question I

5   have for the Government on restitution is that there is

6   a procedure under 28 USC 3664 which envisions that,

7   during the presentence report process, the Government

8   would notify Probation of the potential victims, and

9   the intention of all of that is that, when I am sitting

10  here making a determination about a sentence, that I

11  have all of this information in front of me.  And there

12  is a small window that says that, if a victim's losses

13  are not ascertainable by a date that is ten days prior

14  to sentencing, I can set a date not to exceed 90 days

15  after sentencing.

16         So here I think what you've given me, as I

17  understood from your sentencing memorandum, is a

18  document that was -- reflects attorneys' fees incurred

19  by Georgetown through August 28.  That's a date that

20  was more than ten days before sentencing, so how do you

21  get that in now?

22         MS. KEARNEY:  Your Honor, while the last date of

23  the costs incurred was more than ten days before

24  sentencing, I don't believe that Georgetown necessarily

25  had that information on August 28th.

1      THE COURT:  Why not?

2      MS. KEARNEY:  Because the law firm would have to

3  prepare their bills and --

4      THE COURT:  Okay.  So normally a law firm will

5  prepare their bills with the urgency that their client

6  tells them, and certainly the law firm would be the one

7  to know that there is a statutory timeline for

8  submitting these expenses.

9      MS. KEARNEY:  And, Your Honor --

10     THE COURT:  So how do I -- it just -- I

11  understand that it is important to make sure that

12  victims are entitled to their appropriate restitution,

13  but there is a procedure, and it seems that this is

14  just sort of ignoring that.

15     MS. KEARNEY:  Your Honor, I don't have a reason

16  why Georgetown did not get the information to the

17  Government earlier.  We were provided the information

18  on September 18th.  We promptly provided that

19  information, as I said, to Probation and to defense

20  counsel.

21     I would note the two cases that we cite in

22  Footnote 3 of our brief do focus on the purpose of the

23  statute being to compensate victims not at the sake of

24  procedure.  And, in fact, in the *Dolan* case, 560 US

25  605, there the Court noted that all the information

1    necessary to determine restitution was available before

2    the deadline, and the Court still had the authority to

3    order restitution after the deadline.

4            Likewise, in the *Cheal* case from the

5    First Circuit, 389 F.3d 35, the Government, at a

6    minimum, could provide an estimated restitution amount

7    at the sentencing, and the Court had the authority to

8    hold a hearing later to determine that final

9    restitution amount.

10           THE COURT: So in the *Parling* case, the Supreme

11   Court acknowledged that, although the primary purpose

12   of restitution is to reimburse the victim, that it has

13   a punitive effect, and it is potentially something to

14   consider under excessive fines.

15           So the Government is putting me -- or the victim

16   is putting me in the situation where I am entering

17   judgment today that would include an appropriate amount

18   of a fine, and then you're saying to me, In 90 days, we

19   can come forward and tell you the amount of restitution

20   that should be awarded.

21           And I've previously asked the Government's

22   position on this question in a different case as to

23   whether I could then amend the judgment fine, the

24   answer being no. So you've put me in a position at

25   sentencing of trying to determine what the right

punishment is, and what you're basically saying to me

is, Impose a punishment that includes a fine -- that's

part of what you've said -- and at the same time we're

going to come back, that in order to respect the

victims' needs, will have a second punitive effect on

the Defendant.

MS. KEARNEY:  Your Honor, I believe that one of

the issues with the restitution here is that this is

one of several Defendants who've been charged who

victimized Georgetown --

THE COURT:  And, in fact, the Georgetown

statement focuses on Defendant Ernst, not Defendant

Semprevivo.

MS. KEARNEY:  Correct.  And one of the issues is

that Georgetown is still incurring losses in connection

with those other Defendants in terms of participating

in the investigation and prosecution.

THE COURT:  And as to expenses that are ongoing

and later, I think those do fall within the statutory

provision for amounts that are not yet ascertainable.

So I acknowledge that later expenses may still be

raised up through a later date.

MS. KEARNEY:  Correct.

THE COURT:  My problem is this first $105,000.

MS. KEARNEY:  But the fact that later expenses

1    can later be raised I think goes to your concern about,

2    Is this now overly punitive?  Because even in cases

3    where later expenses are ascertained after the 60 -- or

4    excuse me -- after the 90 days after sentencing, Courts

5    still have the authority to award restitution in those

6    cases, and it's not considered overly punitive.

7          THE COURT:  Well, it might be.  I mean, the

8    Supreme Court hasn't directly held this, but they

9    certainly said it may be something to consider as to

10   whether something amounts to an excessive fine.

11         MS. KEARNEY:  And I believe that would be an

12   issue that the Court could analyze at the later

13   hearing.  Again, we've asked that this restitution

14   amount not be entirely on Mr. Semprevivo, we've asked

15   for it to be awarded joint and severally with the other

16   Defendants, and in that case, the Court can make the

17   analysis at that further hearing whether

18   Mr. Semprevivo's portion would be overly punitive.

19         THE COURT:  Well, I don't remember -- I don't

20   have the list in front of me of who has some

21   involvement with Georgetown and who doesn't and who has

22   pled guilty and who doesn't, but it's possible -- there

23   are 50-some Defendants here -- it's possible that there

24   may be some persons who might be part of this involved

25   with Georgetown whose resolution at sentencing will be

1 much later than the 90 days.

2 　　　MS. KEARNEY:  Yes, Your Honor.  And that's one

3 of the difficulties we're faced with and why we are

4 asking not to address that issue today but to put it

5 off for a later date so that we will have more

6 information as to who has been convicted by that time.

7 　　　THE COURT:  Yes?

8 　　　MR. KENNER:  Yes.  May I be heard, Your Honor?

9 　　　I was planning to address restitution as part of

10 my letting the Court understand our sentencing

11 position.

12 　　　The first thing I want to say is I heard

13 Your Honor make reference to a letter from Georgetown.

14 I have not received a letter from Georgetown.  I

15 received four pages breaking down the legal expenses of

16 a law firm.

17 　　　THE COURT:  I'm sorry.  I listed the letters.  I

18 asked if you had reviewed everything.  Let's go back.

19 And maybe I didn't list it as one of the documents that

20 I have received and reviewed.

21 　　　Victim-impact statement from Georgetown dated

22 August 2nd, 2019.  Are you saying you did not receive

23 that?

24 　　　MR. KENNER:  I have four copies of the -- four

25 pages of the expense report.

1        THE COURT:  Can we make a copy of that?  I have

2    it here, and let's provide a copy to --

3        MS. KEARNEY:  And Your Honor, I would note it's

4    attached to the presentence report as well.

5        PROBATION OFFICER:  Yeah, I believe it was sent

6    as an attachment to the final presentence report.

7        MR. KENNER:  I'm sorry.  It didn't have these

8    numbers at the time.

9        THE COURT:  No, no.  It doesn't have any

10   numbers.  It's a letter.

11       MR. KENNER:  Yes.

12       THE COURT:  So let's just make sure you have the

13   letter that I'm referring to --

14       MR. KENNER:  Yes.  Well, that --

15       THE COURT:  -- this August 2nd letter.

16       MR. KENNER:  Yes, I have that, Your Honor.

17       THE COURT:  That's the only letter that I

18   received from Georgetown.  But that is the

19   victim-impact statement that was submitted by

20   Georgetown.  So now, if you can -- was there any

21   further question on that?

22       MR. KENNER:  I just wanted to make reference to

23   an email that I sent to Ms.  Kearney after I received

24   these numbers asking for any material that is reflected

25   by these hours of attorney service that had to do with

1    Mr. Semprevivo and Georgetown.  I have to assume, for a

2    $105,000 of subpoena compliance, that they must have

3    had some information there relative to Mr. Semprevivo.

4         I note that there was an internal investigation

5    done at Georgetown in 2017, before this case came to

6    be.  I don't know if this material includes that

7    investigation.  That was an investigation of Mr. Ernst.

8    In 2017, he was relieved of his duties during the

9    investigation.  He was terminated on I believe the 6th

10   of June of 2018, and I am led to believe that he got a

11   letter of recommendation from Georgetown to the

12   University of Rhode Island to coach tennis.

13        My point is, Your Honor, there has to be

14   material that is represented by this that has to do

15   with Mr. Semprevivo.  Why I haven't been provided that,

16   I don't know.  I certainly think I'm entitled to it, at

17   least to the extent that it pertains to my client.

18        THE COURT:  Okay.  So this is what we're going

19   to do on the restitution issue at this point, only as

20   to the objection in the presentence report:  I'm

21   overruling the objection.  I'm keeping the presentence

22   report the way it is.

23        That said, the victim has their own rights and

24   ability to ensure that these issues are addressed and,

25   if necessary, addressed on appeal.  So if the

1   Government is asking for a hearing within 90 days, I

2   will set the hearing, and we will address things there.

3         It is also my intention, unless someone

4   convinces me that this would not be a legal way to

5   proceed, it is my intention to make any fine in this

6   case to be an amount less any amounts of that that are

7   paid for restitution.  So in the event that I award --

8   I impose a fine, I don't intend the fine to be

9   duplicative.  I will fine at the maximum amount of the

10  fine I think is appropriate, but I don't intend to do

11  the fine with restitution in excess of that fine or

12  without taking into account that fine.

13        So I can't -- once I enter the judgment, I can't

14  change the fine, but I do believe I can state on the

15  judgment a fine of X amount, less amounts ordered for

16  restitution.

17        Is there any objection to my proceeding in that

18  manner?

19        MS. KEARNEY:  No, Your Honor.

20        MR. KENNER:  No, Your Honor.

21        THE COURT:  Okay.  So I think that resolves all

22  of the objections.

23        For Probation, was any information withheld from

24  the presentence report pursuant to Rule 32(d)(3)?

25        PROBATION OFFICER:  No, Your Honor.

1          THE COURT:  Thank you.

2          Okay.  So that takes us to the guideline

3    sentencing calculation.  The base offense level, I

4    think everyone agrees, is 7.  Based on my prior

5    findings regarding the claimed gain and loss, rejecting

6    that argument, there are no increased levels, getting

7    us to an adjusted offense level of 7; a two-level

8    decrease for acceptance of responsibility, total

9    offense level of 5.

10          And I guess, just to keep the record clear here,

11   the Government objects to that calculation; is that

12   correct?

13          MS. KEARNEY:  Yes, Your Honor.

14          THE COURT:  And in the Government's view, the

15   total offense level should be --

16          MS. KEARNEY:  In the Government's view, the

17   total offense level should be a 16.

18          THE COURT:  Okay.  And I have found and do

19   continue to find the appropriate total offense level

20   here is a level 5.

21          I think everyone has agreed there are zero

22   criminal history points, which puts Mr. Semprevivo in

23   Criminal History Category I.

24          So in terms of the sentencing options before the

25   Court, under the statute, I have authority to impose a

sentence of -- a custodial sentence of not more than 20 years. Under the guidelines, as I have calculated them, that is a custodial sentence of zero to six months; under the statute, supervised release of not more than three years, a guideline provision would be one to three years; probation under the statute would be one to five years, guideline is not more than three years; statutory provision is not more than 250,000 or twice the gain/loss, which I have determined here to be zero, so it would be not more than 250,000, the guideline provision is 500 to 9,500; and special assessment of $100; and restitution, which I am holding thus far was not timely submitted as to past restitution but which may be available for future restitution or ongoing expenses.

Any disagreement with those calculations other than the Government's objection, as previously stated?

MS. KEARNEY: No, Your Honor.

MR. KENNER: No, Your Honor.

THE COURT: Okay. So with that, I will hear from the Government.

MS. KEARNEY: Thank you. May I use the podium?

THE COURT: Absolutely.

MS. KEARNEY: The Government's sentencing memorandum highlights the contours of Defendant's

1   conduct.  He involved his son in his scheme, including

2   by having him send a completely false email to

3   Gordon Ernst, the Georgetown tennis coach, stating that

4   he played very well with terrific success in doubles

5   this summer and played quite well in singles too and

6   was looking forward to having a chance to play for

7   Ernst at Georgetown.

8       This Defendant paid the highest bribe amount of

9   any Defendant before the Court in this case, $150,000

10  more than the bribe paid by Devin Sloane who was before

11  Your Honor two days ago.  He knew that his payment was

12  going to bribe Ernst and was not going as a donation to

13  Georgetown.  He carried out his calculated and

14  strategic conduct over the course of eight months,

15  despite numerous opportunities to stop the process

16  between the time he caused his son to send that email

17  to Gordon Ernst in August of 2015 and his payment of

18  that $400,000 bribe in April of 2016.  And, by the way,

19  that email that kicked off the scheme was sent two

20  months before his son's Georgetown application was

21  submitted and five months before the application was

22  actually due.

23      And after he was arrested, after he pled guilty,

24  he's tried to retain the fruits of his fraud by suing

25  Georgetown to enjoin it from expelling his son,

1    essentially revictimizing the University.

2         THE COURT:  Okay.  So let me now cut in to this

3    question about how I should view litigation.  Here are

4    my difficulties with the weight you want to put on that

5    filing:  In the record I have in front of me -- and I

6    have not gone to those Courts and those dockets and

7    downloaded those -- but the record I have in front of

8    me, even before the proffered affidavit here, I have a

9    lawsuit is filed and a lawsuit that is withdrawn.

10        My assumption, without even reading this

11   affidavit, is that there was a private resolution.  I

12   don't know what that private resolution is.  I don't

13   know the nature of -- well, I don't know the private

14   resolution.

15        Are there words in that complaint that were

16   filed by these lawyers on behalf of Mr. Semprevivo's

17   son that sure look bad for Mr. Semprevivo?  There may

18   well be.  Does that suggest good judgment in the choice

19   of words to be used?  Maybe not.

20        But the underlying legal issue does seem a side

21   issue, and without my opening up what happened and what

22   the nature of the resolution and the underlying claim,

23   it does seem that to pin that litigation as a driver of

24   this action is unhelpful and essentially would -- I

25   mean, I do think that, if that is where you go, I then

1    take this affidavit, if I find there's sort of a

2    conflict between the information I have, you know, do I

3    delve into it?  Do I have an evidentiary hearing about

4    what did and didn't happen at Georgetown?

5        I don't think that's the criminal sentence

6    that's in front of me.  So I think this is a point

7    where the Government really can choose your direction

8    here.  If the argument you want to make to me is that I

9    should take into account the litigation, then I will

10    allow this affidavit, which I have not yet read

11    carefully, to be filed, and we may need to get into

12    what did or didn't happen at Georgetown.

13        MS. KEARNEY:  Your Honor, the Government does

14    not feel that you need to get into a dispute about what

15    happened in the litigation.  The Government also

16    doesn't know the resolution that was reached other than

17    what Defendant has put in his own papers.  Even before

18    he put in that affidavit, he acknowledged that the

19    result of the action was that his son was allowed to

20    keep the credits he had earned at Georgetown.

21        THE COURT:  Okay.  So I don't have in front of

22    me a meritless suit.  I don't have in front of me

23    litigation that was dismissed by the Court; I have in

24    front of me litigation -- I would agree with you that

25    there are choices of words used by the lawyers that are

somewhat inappropriate and perhaps get into the whole

idea of Mr. Semprevivo's reliance on experts and that

maybe he should have used his own judgment to tone some

of those words down.

But regardless, I have a lawsuit that asserted a

claim that was resolved to the agreement of those

parties.  I can't just say that this was a frivolous

lawsuit that should somehow be sanctioned.  I think the

Government's words in your brief were actually quite

strong.  I think you said it was an abuse of process.

"Abuse of process" is a legal term, and you know,

Mr. Semprevivo's son, regardless of what his father

did, Mr. Semprevivo's son had a right to petition for

redress of grievances.  That's what your

First Amendment right is.  You can file a lawsuit.  And

it wasn't thrown out of Court, it wasn't dismissed.  To

call that an abuse of process seems to me to be pushing

the argument away.

But, at any rate, if you do want to go there, I

put the affidavit in, we'll get into what the merits of

what the resolution were.

MS. KEARNEY:  We'll move on.

THE COURT:  Okay.

MS. KEARNEY:  In fact, I want to focus today on

what sets this Defendant apart, and that's a level of

egregiousness beyond what has been seen so far in this case.

Two days ago, the Court observed that the suggestion that the focus of this case is on independent school students was about as tone-deaf as you've heard. Well, I think we have a new winner. In his sentencing memorandum, the Defendant refers to himself as the victim throughout his brief. The Defendant's audacity is breathtaking.

He pled guilty to get the benefit of an early plea, and now he claims he is the victim, literally. He writes, at Page 6 of his sentencing memo, "Singer began to create what would eventually become his college racketeering enterprise in which he would gross more than $25 million from victims like Stephen Semprevivo." And at Page 11, he says that he is analogous to a victim in a Hobbs Act extortion.

This is not the Government summarizing or reading into the Defendant's brief; these are the Defendant's own words. He is not a victim; he is a co-conspirator. The victims are the University and the students who did not get into Georgetown because of the bribe Defendant paid. It's like Defendant does not even remember that he pled guilty to a Federal crime. His own words reveal a lack --

1    THE COURT:  Just to be clear, he did allow this

2    memorandum to be filed on his behalf, but since

3    everything here is being amplified around the country,

4    let's be very clear.  I have Mr. Semprevivo's own

5    words, those are his letter to the Court; I have the

6    words that are offered on his behalf by his lawyer.  So

7    when you say "in his own words," refer to his letter,

8    and if you want to talk about the memo, the memo filed

9    on his behalf.  I will take it that he's responsible

10   for what is filed, but you're going to have the press

11   corps quoting you as saying, This is in his own words.

12   It's not his own words; it's his lawyer's words that he

13   allowed to be filed on his behalf.

14       MS. KEARNEY:  Thank you for that clarification.

15       The words in his sentencing memo reflect a lack

16   of acceptance of responsibility and a disturbing lack

17   of remorse for his conduct.

18       A term of imprisonment is necessary for this

19   Defendant to understand the seriousness of his offense,

20   to gain respect for the law and to receive just

21   punishment.  Quite simply, this Defendant does not

22   believe he should be here.  Under the words of his

23   sentencing memo, he thinks he is here because of

24   someone else's crime against him, that he is a victim

25   of a Hobbs Act extortion.

1    In trying to convince the Court that he is
2  the victim of his own crime, the Defendant blames
3  Rick Singer for his conduct.  He claims that he, a
4  successful businessman with an undergraduate and MBA
5  from Harvard, was afraid of the college counselor and
6  what Singer would do to his son's applications if he
7  pushed back.  But Defendant had no problem taking
8  control of his son's applications and submitting those
9  applications to other schools, despite Singer's
10  purported pressure not to do so and Defendant's claimed
11  fear of Singer's reaction.
12    Most tellingly, though, Defendant had no problem
13  pushing back on Singer in the consensually recorded
14  calls, telling Singer, "Your dealings are your
15  dealings, you did what you did, that was your stuff.
16  I'm not going to take accountability for your actions."
17  The calls make clear that Defendant was no passive wall
18  flower or Singer's puppet; he was in control on those
19  calls, trying to push the blame onto Singer and away
20  from himself, just as he is trying to do now.  But it
21  gets even --
22    THE COURT:  I agree with you that this Defendant
23  and all of the parents are fully responsible for their
24  own acts, and I agree with you that they aren't the
25  victims.  But just to be clear, is the Government not

1    taking the position that Mr. Singer is the leader of

2    this conspiracy?

3         MS. KEARNEY:  No.  The Government is fully aware

4    that Mr. Singer is the leader of this conspiracy, but

5    that doesn't negate the Defendant's conduct.

6         THE COURT:  No, no.  But it doesn't -- you're

7    not contending in any of these cases that the parents

8    enticed Mr. Singer into this scheme?

9         MS. KEARNEY:  No.  But at the same time, the

10   parents made the decision, and Mr. Semprevivo made the

11   decision, to go forward.

12        THE COURT:  That's noted.  I'm not the one who's

13   going to be sentencing Mr. Singer, but I just -- as

14   these various arguments and positions from the parents

15   are being filed, I agree with the Government entirely

16   that the parents need to be held accountable, but I'm a

17   little -- it is a little concerning when the leader of

18   the conspiracy is the cooperator, to take some concern

19   that his role in this isn't minimized.  I don't want to

20   say it excuses in any way, but I just -- I hear a

21   little bit of a suggestion that somehow Mr. Singer is

22   not blame-worthy, and it's just, let's be very clear,

23   I'm not sentencing Mr. Singer, his blame isn't here,

24   but he does appear to be the leader of this, not the

25   follower.

1    MS. KEARNEY:  Yes, Your Honor.  And I apologize

2    if my words came across as minimizing Mr. Singer.  The

3    intent was to show that the Defendant's attempt to

4    minimize his responsibility falls flat.

5        THE COURT:  Understood.

6        MS. KEARNEY:  Perhaps most brazenly in this

7    case, though, the Defendant claims that he has been

8    punished enough already because of the financial losses

9    he purportedly suffered as the victim of his own crime.

10   He claims losses of his attorneys' fees in this case,

11   the $400,000 bribe he paid, the taxes he owes on that

12   bribe after he fraudulently deducted it from his taxes,

13   and the tuition payments he made to Georgetown.

14       The notion that this Court should go easy on the

15   Defendant because he lost the value of his $400,000

16   bribe or the taxes he now owes on that bribe is not a

17   concept found anywhere in the 3553(a) factors.  That

18   Defendant had the audacity to even consider these,

19   quote, unquote, losses to be punishment further

20   demonstrates his lack of acceptance of responsibility

21   and his lack of remorse for his conduct.

22       In a true reflection of how little remorse he

23   feels, in his sentencing memo, the Defendant does not

24   even mask that he was engaging in this conduct for his

25   own benefit.  He was not doing what was best for his

son; but, rather, sought to get what he refers to, or his attorneys refer to at Page 7 of his brief, as the holy grail for successful businessmen and professionals like himself, admission for his child to an elite university, in other words, bragging rights.

That Defendant still cannot admit that what he did was criminal underscores the need for a sentence above the Court's calculated guidelines in this case, and for these reasons, the Government requests a sentence of 13 months' imprisonment, a $95,000 fine, 12 months of supervised release and restitution to Georgetown. Such a sentence is sufficient but not greater than necessary to achieve the purposes of 3553(a).

THE COURT: Thank you.

I'll hear from Defendant's counsel.

MR. KENNER: Thank you, Your Honor.

Your Honor, I'm going to attempt to use my time to address what I believe to be Your Honor's key and core concerns with respect to how to calculate and impose sentence on Mr. Semprevivo.

The Government argues that there has not been an acceptance of responsibility. The Government argues that the sentencing memorandum filed on his behalf disclaims a crime having been committed by

1    Mr. Semprevivo, and the Government claims that he has

2    not accepted responsibility.

3        I would like to refer the Court first to Page 2

4    of the sentencing memorandum where, and I quote from

5    it, "Semprevivo was informed that a 'donation to

6    Singer's 501c3 charity, Key Worldwide Foundation" would

7    be used to benefit the tennis program at Georgetown and

8    garner for his son a preferential admission to the

9    program.  Semprevivo knew that the amount requested,

10   coupled with the email and essay holding his son out as

11   a competitive tennis player directed to Coach Ernst,

12   were not logically related to a charitable donation.

13   As Stephen Semprevivo noted in his letter submitted to

14   Probation, that was when he should have notified the

15   authorities."

16       And on Page 3, it goes on to say, "Semprevivo

17   verily believes that some part of the $400,000 paid to

18   Key Worldwide was received by Ernst through Singer.  It

19   is believed that Singer took part of the money as

20   well."  I don't think that that is reflective of a

21   denial of having committed the crime.

22       On Page 10 of the sentencing memorandum, it

23   reads, "Semprevivo felt that he had been placed in a

24   quandary to make a judgment.  For many reasons, as

25   amplified in Dr. Romanoff's report, Semprevivo did not

1    choose wisely.  By failing to stop the process, he went

2    from being a victim to also becoming a co-conspirator.

3    Singer never told him that the tennis coach was being

4    bribed and that the money was being split with Singer.

5    He realized that taking a shortcut outside normal

6    admissions process was wrong and illegal, and his own

7    failure to act was wrong.  He was and remains deeply

8    remorseful that he acted against his own character and

9    diminished himself by surrendering his integrity."

10    Finally, Your Honor, I would quote from Page 11

11    of the sentencing memorandum where we say, "The crime

12    is certainly serious, and there's no question about

13    that.  The nature and circumstances of this offense

14    clearly show that Semprevivo knowingly broke the law,

15    permitting false emails and essays to be transmitted

16    through the mails.  Clearly some payments paid to

17    Singer's ostensible 501c3 charity went to compensate

18    the tennis coach to get a preferred admission.

19    Stephen Semprevivo knows he was wrong and suffers from

20    that daily."

21    So, Your Honor, while the Government chooses to

22    select some portions of the sentencing memorandum, I

23    would submit to this Court that to glean from the

24    overall sentencing memorandum that Mr. Semprevivo

25    perceives himself to be a victim is disingenuous on the

1    part of the Government.

2         Your Honor, I also want to, if I might -- I

3    would also like to read from some of the sentencing

4    memorandum -- some of the letters that we submitted

5    together with the sentencing memorandum.  They all go

6    to the question of when and that he accepted

7    responsibility.

8         THE COURT:  I am going to let you make your

9    presentation as you see appropriate.  I do read all the

10   material that is submitted to me.  And I maybe should

11   say to you before I get nine more of these, I don't

12   feel I need an expert report from a criminologist to

13   tell me how to rule here, particularly where it's the

14   same criminologist that's going to be probably

15   presenting for everybody in LA.  I'm not sure.  But I

16   don't need that.  I am reading -- I don't need someone

17   to have quoted all the letters to me.  I'm reading the

18   letters.  I'm reading the material.  This notion of

19   primary sources?  I'm going to the primary source.  I'm

20   not going to the criminologist's review of the primary

21   source.

22        You're welcome here to present what you need to

23   present here, I don't want to cut you off, but do rest

24   assured I have read the material in front of me.

25        MR. KENNER:  Your Honor, I know that.  I simply

want to read from the letters a sentence or two that refers to acceptance of responsibility. And it's important to note that these letters that I'm making reference to were written long before the -- any sentencings in this case took place.

And I want to start, if I can, with Mr. Semprevivo's letter where he says, "This is not a letter" -- well, you've read his letter. You know what it says. I don't have to quote from it. But it's a clear statement of acceptance of responsibility. Rita Semprevivo, his wife, attests to his acceptance of responsibility.

Andrew Chambers, who I asked if Your Honor would be willing to listen to -- might this be an appropriate time for me to ask him to interrupt me to address the Court?

THE COURT: That would be fine.

MR. KENNER: Thank you.

Go to the podium, please.

MR. CHAMBERS: Your Honor, thank you for this brief opportunity to address the Court.

I was an FBI Agent for 30 years almost, serving from 1985 to 2014. My wife reminded me we've actually known Mr. Semprevivo for 19 years, not 15 years. She's usually right.

1          So I have only two topics I wish to address.

2     Stephen -- number one, Stephen Semprevivo is a good

3     husband, a good friend, a good father, until recently a

4     law-abiding member of the community.  After this over,

5     I am sure he will be another law-abiding.

6          After -- second topic:  After his arrest, I

7     reached out to Steve, offering to write a letter on his

8     behalf to the Court, if needed, addressing his normal

9     integrity and character.  That conversation started

10    with me trying to explain and rationalize what had

11    happened based on my readings.  Steve wanted nothing do

12    would that.  He totally accepted his guilt.  He stated,

13    "This is on me."  He's never tried to explain it.  He's

14    never made up stories.  I do believe he has totally

15    accepted his guilt.

16         As an FBI Agent working 25 years criminal,

17    mainly 91 matters, bank robberies, I dealt with a lot

18    of criminals, and I rarely saw that acceptance of

19    guilt.  Obviously, it was a different avenue, but I do

20    ask that the Court take this in consideration and give

21    the most downward departure possible.

22         Thank you.

23         THE COURT:  Thank you.

24         MR. KENNER:  Thank you, sir.

25         I would refer next to the letter of

1  Mr. James Burns written on April 28th of 2019 where he
2  says, relative to acceptance, "Knowing Stephen's
3  temperament, values and what a deliberative thinker he
4  is, I was shocked to learn of his involvement in this
5  case.  But I was not surprised when Stephen told me
6  straightforwardly and without explanation that he was
7  guilty and that he was going to be accountable for his
8  actions."

9       That same sentiment is expressed next,
10  Your Honor, by James Celentano where he writes, "When I
11  finally spoke with Stephen over this past weekend" --
12  and this letter is -- I'm sorry -- this letter is dated
13  April 30th of 2019 -- he says, "He shared how much he
14  regretted his actions, the pain the situation has
15  created, especially for his son, and what a profound
16  learning experience this is for him.  Knowing Stephen
17  all these years, it was not surprising that he is
18  accepting responsibility, pleading guilty and seeking
19  to learn and give back to society as much as he can."

20       Mark and Renee Paul, who I'll speak about later,
21  write in their letter dated May 24th, 2019, they that
22  they introduced Stephen to Mr. Singer after he worked
23  with their child.

24       The next letter is a letter from Sandy Vella.
25  Sandy Vella writes on April 26th of 2019, "In order to

1  grow and help kids grow, Stephen knows he not only

2  needs to accept what he did but must lead the way,

3  ensuring this experience is not forgotten."

4       On May 27th of 2019, Matthew Coffin writes, "The

5  first time that Stephen and I spoke of this unfortunate

6  situation, he did not give me a story of 'they don't

7  understand' or 'everyone is doing it.'  Instead, he

8  stated to me quite clearly that he was ashamed and was

9  not going to fight this, again, taking the humble and

10  responsible person's approach."

11       Your Honor, I could go through 15 more and read

12  from them.  I'm sure Your Honor has read them.  They

13  all attest, at a very early stage of these proceedings,

14  Mr. Semprevivo's acceptance of responsibility.  We say

15  it in our sentencing memorandum, all of these people

16  say it, and most importantly, as Your Honor said,

17  Mr. Semprevivo says it himself.

18       The Government makes the point about

19  Mr. Semprevivo having involved his son, and as he has

20  said, that is something for which he has great shame

21  and terrible remorse.  But I want Your Honor to

22  understand, just to give context of this case, this is

23  not a case where an African American tennis player was

24  replaced for a white tennis player in its application

25  that Mr. Singer sent to a number of institutions,

1    including Georgetown.  This was not a case where, as

2    you heard the day before yesterday, where a costume was

3    obtained, a hat or a cap with "Italy" on it.  This was

4    not a case where Adam Semprevivo cheated on his scores,

5    on his test scores --

6         THE COURT:  Why do you say this isn't a case

7    where another applicant didn't lose out on a position,

8    on a placement?

9         MR. KENNER:  No.  I'm saying this is -- I'm

10   trying to put it in a continuum, the levels of

11   involvement.

12        THE COURT:  I understand that, but you just made

13   the assertion that this isn't a case -- and you used

14   race, but putting race aside, this is a case where one

15   student got the position instead of a different -- got

16   the offer letter instead of a different student.

17        MR. KENNER:  There is no question, and we

18   acknowledge that, and I will speak to that momentarily.

19        THE COURT:  I don't have evidence what color

20   skin the person had who didn't get it or what their

21   income was.  I do know that the person who got it is --

22   I don't know, but I'm perhaps guessing here probably

23   didn't have the same resources to pay a $400,000 bribe

24   for the position or Mr. Singer might have offered it to

25   them.  It's a different person who didn't get that

offer, no?

MR. KENNER: Your Honor, we raised this in a footnote on Page 11 of the sentencing memorandum, and I want to be very clear, this is not a victim-less crime. Your Honor is wholly and totally correct about that. Georgetown is not a victim of Stephen Semprevivo, in my view; they're a victim of Gordon Ernst.

The children that did not get an opportunity to get the spot that Mr. Semprevivo's son got, they are the victims of Mr. Semprevivo, and we accept that and want to be very clear about it.

THE COURT: Just so we're clear about Georgetown's standing here in this case, I have agreed with the Probation Officer that they did not articulate specific monetary losses sufficient to be measured for purposes of gain and loss. I have not found that they aren't a victim of this conspiracy, and the conspiracy is the crime in front of me. And so to say, Well, it was Mr. Ernst's part of the conspiracy rather than Mr. Singer's part of the conspiracy, rather than Mr. Semprevivo's part of the conspiracy, I can't parse it that way. I think that, as long as you agree that Georgetown is a victim of the conspiracy, then it's a victim.

MR. KENNER: I do believe that they're a victim

1    of the conspiracy.  I also agree that Mr. Ernst was

2    paid $2.5 million, going back to 2012, by Mr. Singer.

3    I also agree that there was an investigation by

4    Georgetown in 2017, an independent internal

5    investigation of Gordon Ernst.  The results of that

6    independent investigation were that Mr. Ernst was

7    placed on leave and then terminated and fired from the

8    University.  I don't know what that report actually

9    said.  I've been asking for it.  I have never received

10   it.

11        THE COURT:  Well, and in the event that I don't

12   order restitution and Georgetown proceeds on a civil

13   claim for a claim based on a loss of honest services of

14   Mr. Ernst, all of that might come out in discovery.

15        But that's not where we are here.  We're in this

16   criminal proceeding here.

17        MR. KENNER:  I understand that, Your Honor, and

18   I want to also acknowledge that the essence of the

19   crime here is the corruption of the college admissions

20   program or the methodology by which it takes place

21   that Mr. Singer facilitated, Mr. Semprevivo paid him,

22   he knew that money was being paid as a bribe to

23   Gordon Ernst, and it's not a victim-less crime,

24   Your Honor.

25        I wholeheartedly agree, and I want to underscore

1    that on behalf of Mr. Semprevivo who says that

2    essentially in his own memorandum, and other people

3    have said it as well, that there are people who didn't

4    get a spot that Mr. Semprevivo's son got because of the

5    bribe that was paid from Stephen Semprevivo to Singer

6    to Ernst, and that's clear.  And we own that, and I

7    believe we have no -- Mr. Semprevivo wants to own it,

8    and he's owned it since the time he entered the plea in

9    this case.

10          I want to move to the 3553 factors.  Your Honor,

11    again, in seeking a punishment sufficient but not

12    greater than necessary in this case -- and I know you

13    want to address each Defendant individually and with

14    respect to their situation -- I can say, and I know

15    Your Honor has read all of it, that Mr. Semprevivo,

16    unlike Government's depiction, has accepted

17    responsibility and has expressed great remorse, which

18    he will live with for the rest of his life.

19          This is not a situation where he is trying to

20    walk away from this.  He acknowledges that the crime

21    was committed; he acknowledges that he hurt the child

22    that didn't get in; he acknowledges that he hurt the

23    integrity of the entire admissions process, as it's

24    meant to be; and he understands that he was a

25    participant in the corruption of the admissions scheme,

and I don't say that derogatorily, but the way in which colleges approach admitting students.

And for all of that, he is very sorry. And unless Your Honor has any other questions, I would submit on that.

THE COURT: You had mentioned before you had one other person who --

MR. KENNER: Oh, yes. I'm so sorry. Mr. Pratt.

MR. PRATT: Good morning, Your Honor.

THE COURT: Good morning.

MR. PRATT: I'm proposing that Mr. Semprevivo begin immediately work as a full-time volunteer for Volunteers of America of Los Angeles in behalf of a number of our youthful clients. The first group is runaway homeless youth, including great numbers of LGBTQ and victims of sex-trafficking and young newly discharged veterans who have become homeless and are exhibiting symptoms of PTSD.

This focus will be on job training in the construction trades for these young people. And this project only came about because of six months of work beginning in the beginning of April on the part of Mr. Semprevivo, creating a social enterprise for Volunteers of America, which would be a business, placing two- and three-bedroom units in the back yards

1  of single-family residences in Los Angeles, producing

2  income to underwrite the training for this population

3  of youth.

4         I see Mr. Semprevivo as a key part of that

5  training.  It's a combination of classroom and

6  on-the-job training with the installation of these

7  units, and a lot of key issues need to be worked with

8  with these youngsters, including world-of-work issues,

9  what it takes to get and hold a job; financial

10 literacy; and, even more particularly, the one

11 commonality of these youngsters, sadly, is what we call

12 deficiency stories.  They have been told in so many

13 different ways that they'll never amount to anything,

14 and that's a real story for them, but it's not a true

15 story.  I've seen Mr. Semprevivo as an entirely

16 compassionate and engaged person, internally motivated

17 to do something about social problems.

18        The other group that he will work with are

19 Upward Bound students.  Upward Bound is a program that

20 volunteers operates throughout the City of Los Angeles

21 providing pre-college support for youngsters who will

22 be the first in their family to attend college.  The

23 Upward Bound regimen is extensive.  All day Saturday

24 the students come together for workshops, for financial

25 counseling and for other things that are going to be

1    necessary for them to not only succeed in enrolling in

2    college but completing their degrees.

3         The other facets of the program provide

4    after-school tutoring for the youngsters, sometimes at

5    our program site, sometimes in the high schools

6    themselves, and there's also a provision for after

7    hours that is convenient for the students when they're

8    doing their homework for Skype interaction, and I would

9    propose that Mr. Semprevivo be part of all of that.  A

10   lot of these students have a great interest in

11   business, but they're intimidated.  I can't think of a

12   better role model for business than Mr. Semprevivo.

13        And an interesting side light that I've

14   experienced with him -- he's got a wonderful,

15   easy-going, accepting, patient disposition -- is he's

16   badgered me continuously for all the information I can

17   gather for him about the homeless issue in Los Angeles

18   and about what the solutions would be.

19        So I would offer the Court this opportunity as

20   an alternative in behalf of Los Angeles's most needy

21   youngsters.

22        Thank you.

23        THE COURT:  Thank you.

24        MR. KENNER:  Your Honor, might I just add the

25   programs specifically are set forth in the Attachment 2

1   that I provided you a more legible copy of and has --

2   Mr. Semprevivo has made a commitment to every Saturday

3   and two afternoons or evenings a week to work with

4   these children, and he has been working with Mr. Pratt

5   to get that together and to make it -- they currently

6   serve 500 students.  Mr. Semprevivo's goal -- 500

7   students a year.  Mr. Semprevivo's goal is to increase

8   that to 1,000 students a year.

9           Having said all of that, I am not unmindful of

10  Your Honor's previous comments with respect to the need

11  to have some imprisonment for the people that were

12  involved in this.  I am mindful and respectful of that.

13  And toward that end, I would suggest and recommend to

14  the Court a sentence of 90 days, a split sentence,

15  45 days in custody and whatever -- for the other 45 and

16  more, if Your Honor sees fit, in-house arrest so that

17  he can quickly get back to assisting Mr. Pratt in these

18  great things and still serve some time.

19          THE COURT:  Thank you.

20          Mr. Semprevivo, do you want to address the

21  Court?

22          THE DEFENDANT:  Yes.

23          Thank you, Your Honor.  I deserve to be punished

24  for the illegal actions that I took.  I believe that

25  you will sentence me to some time in prison, and I want

1  you to know that I accept any sentence that you deem

2  fit.  I am fully responsible and take full

3  responsibility for my actions and feel I should be

4  punished.

5       I apologize to the Court, Your Honor, the

6  US Government for all of the resources and time it's

7  taken to bring my case forward.  I apologize to all the

8  college-bound students and their parents and the

9  terrible example I've set for them and the fact that

10  I've led them to lose faith in the college admissions

11  process.  I'm so sorry for that.

12       I apologize to all of the young people who I've

13  mentored throughout my career who I've taught to be

14  honest and trust-worthy both in the office and outside

15  the office first.  I've let you all down, and I'm sorry

16  for that.

17       And I apologize to my wife Rita who has forgiven

18  me, but I don't deserve that.  She's been the rock for

19  us.  She's been supportive to our entire family

20  throughout this.  She doesn't deserve this.

21       I apologize to my son Adam who my activities

22  have hurt him so much.  He's been a great son who has

23  never let me down, and I apologize, Adam.  I've let you

24  down so much here.  You didn't deserve this.

25       I apologize to my son Jordan who, because of all

that's been going on, this has impacted his health.
I'm sorry, Jordan, that had to happen.

I want to apologize to my sister and my brother
who have been very supportive to me throughout this.
I'm sorry for bringing shame on our family.

I want to apologize to the rest of my family and
my friends who have been supportive. I've let you all
down.

Again, Your Honor, I take full responsibility
for my actions. This is the first and only crime and
certainly the last crime I will ever commit. Moving
forward, I'm going to make good and be true to all
those people that I've let down.

I -- you know, after any time in incarceration,
I look to give back to my community, specifically, if
Your Honor deems fit, to work with Volunteers of
America in helping youth and homeless.

Thank you, Your Honor.

THE COURT: Thank you.

So I am required to consider the factors at
18 USC, Section 3553(a), and I have considered those
factors. I need to consider the nature and
circumstance of the offense, the Defendant's personal
criminal history and characteristics, purposes of
sentencing, the kinds of sentences available, the kinds

1　of sentence and sentencing range established for the

2　category of offense committed by the category of

3　Defendant under the guidelines, the need to avoid

4　unwarranted sentencing disparities among defendants

5　with similar records who have been found guilty of

6　similar conduct and the need to provide restitution to

7　victims.

8　　　　With regard to the purposes of sentencing, I

9　must consider those factors that I just listed and

10　impose a sentence that is sufficient but not greater

11　than necessary to comply with these purposes; that is,

12　that they will reflect the seriousness of the offense

13　and promote respect for the law, provide just

14　punishment for the offense, afford adequate deterrence

15　to criminal conduct, protect the public from further

16　crimes of this Defendant and provide the Defendant with

17　corrective treatment in the most effective manner.

18　　　　I'm going to start here with the nature of the

19　offense.  The Government has described two different

20　fraudulent schemes as part of this conspiracy:  The

21　test-taking scheme, which was a set of actions,

22　including bribes and changing test answers; and the

23　recruitment scheme, which includes bribes and

24　fraudulent profiles.  Both of these types of conduct --

25　both of these schemes involved illegal fraudulent

conduct, in violation of the same statute.  The purpose

of the two schemes was somewhat different, though.  The

purpose of the test-taking scheme was to change one

aspect of a student's application to make that

application more competitive.  The purpose of the

recruitment scheme was to gain a specific spot at a

university.

Here, this Defendant was not involved in any way

in the test-taking scheme.  He was, however, involved

in the recruitment scheme.  And as I consider the

culpability of those two different schemes, I do

view -- they're both fraud, they're both illegal, they

both violate the same statute, but there is something

that's an order of magnitude different about actually

buying a specific spot at a university versus

fraudulently changing part of an application.

And so while I -- and I disagreed with the

Government about using the dollar differences that the

different parents paid as a proxy for the gain or loss.

I do think the ballpark prices for the two different

types of schemes, 15,000 to 75,000 for changing test

answers versus 250,000 to 400,000 for buying spots,

showed that Mr. Singer and the parents involved also

have an understanding of the different orders of

magnitude of the two schemes.  So the nature of the

1    crime in front of me was purchasing that spot or trying

2    to purchase that spot, conspiring to purchase that spot

3    at a particular university.

4        The difference between the 250,000 and 400,000

5    doesn't give me any light, though, on culpability.  The

6    fact that one coach charged more to get a spot for a

7    student at one university versus the price that was

8    charged at a different university doesn't make one

9    crime more or greater or less in my mind.  So with

10   regard to the specific offense, I don't see a

11   difference between the parent who paid 250,000 and the

12   parent who paid 400,000 just because the coaches seemed

13   to be charging different prices.

14       This particular crime did involve -- the

15   Defendant did involve his son, and I think that is a

16   factor that does make the nature of the crime more

17   serious, as I think the Defendant understands.  And I

18   do find that the nature of this crime does drive an

19   incarcerative sentence, although I find, unlike the

20   Government, that that should fall within the guideline

21   range of the zero to six months.

22       And part of that and part of the nature of the

23   circumstances here is, again, the nature of general

24   deterrence.  And this is a case that I do -- I don't

25   usually agree with the Government on this, but I do

1     think on this one, this is a -- in this case, that

2     these sentences may have a generally deterrent effect.

3         I turn to the Defendant's personal history and

4     characteristics.  And as with all of these, with the

5     Defendants I have sentenced so far, and I would not be

6     surprised to find the case the same with the Defendants

7     still to come in front of me, the people have generally

8     been law-abiding and respected members and decent

9     members of their community.

10         It doesn't excuse the crime.  It is taken into

11     account to some measure by the fact that there's zero

12     criminal history here and by the fact that I will not

13     be imposing a sentence to protect the society further

14     from this Defendant.  I do view that as helpful in

15     trying to determine any likelihood of recidivism.

16         I did -- and I have a hard time sometimes

17     distinguishing between overzealous advocacy and where a

18     Defendant actually views things.  I don't think that

19     the harm suffered by this Defendant can be seen as

20     greater than the harm that's suffered by a person who

21     commits a felony who is poor.  The dollar value, they

22     may have lost a job that only was paying $10 an hour

23     versus losing a job that was paying much, much more,

24     but certainly the economic effect is going to be far

25     greater on the person who doesn't have the resources

1   both in terms of your background and experience and

2   capabilities and connections.  You don't have to go,

3   when you get out of this, and apply for a job where you

4   have to check a box and will never be considered once

5   you check that box.

6        So somewhere in the papers there was a

7   suggestion of a fear of losing a home or that you won't

8   be able to rebuild your professional life.  I don't

9   find those arguments persuasive, but I also am not sure

10  that those are ones that I am pinning on you rather

11  than perhaps the excessive advocacy here.  I do -- I

12  give you no extra points for the harm suffered, but I

13  am not detracting from -- by the presentation here.

14       I keep coming back to the excuse for what

15  happened here that people are using, and I'd like to

16  quote one of the letters that one of the parents wrote

17  because I think this is something to reflect on.  The

18  parent wrote, "As anybody who has had a high schooler

19  navigating the chaotic, arbitrary and, frankly,

20  terrifying college admissions process knows, the

21  importance of relying on academic tutors and

22  consultants with expertise to help our kids is

23  crucial."

24       That terrifying college admission process, think

25  about how terrifying that college admission process is

1    for the applicant whose parents didn't even go to

2    college.  Think how terrifying that process is for the

3    students and parents who don't have the resources to

4    hire tutors and consultants with expertise no matter

5    how crucial that might be.

6        And think about the inner city or rural students

7    who might not have any resources but nonetheless make

8    their way into a college but with scores more like your

9    kids had before you started tutoring rather than

10    afterward, and they get into these colleges, and their

11    legitimacy is challenged every day that somehow they

12    were the ones who got a break to get there, rather than

13    the child who arrived there with all of these

14    resources.

15        I don't criticize you for being taken in by a

16    person with masterful skills of deception.  That's how

17    crimes happen all the time is some people get other

18    people to commit crimes, and that's where we end up

19    with a crime and a conspiracy.  And I also -- I do

20    understand, from what I'm hearing in these papers, that

21    Mr. Singer was open to parents in rooms, in lecture

22    halls, parents with lots of money to whom he pitched

23    the side door, and I think the question that all of

24    these parents need to ask is not, Well, of course we

25    all hired an expert; I think the question that people

1   need to ask is:  What makes your children entitled to a
2   side door?

3       I am -- as I said earlier, I am not considering
4   the lawsuit against Georgetown in part of the
5   sentencing.  I don't have sufficient information to
6   make any determination that that was an abuse of legal
7   process that overstated the circumstance.

8       I do find that you are remorseful and have taken
9   acceptance of responsibility for this.  And in making a
10  determination that incarceration is needed, I don't
11  believe it is needed further for personal
12  rehabilitation or protecting you from -- protecting the
13  community from you, but I do find that incarceration is
14  appropriate, despite no prior record.

15      I intend to impose a sentence of four months of
16  incarceration; I intend to impose two years of
17  supervised release; community service as part of the
18  rehabilitation, and I will order 500 hours of community
19  service.  I don't have any reason to think that this --
20  your proposed placement is inappropriate, but I will
21  leave that in -- the first review of that by the
22  Probation Office.

23      I am focusing on community service, as it seems
24  like your proposal includes, in making sure that you're
25  not simply using your managerial talents to continue

1   doing managerial work, you're welcome to do that in

2   addition to the 500 hours but that the 500 hours are

3   really directed at the time spent directly with

4   students or families.

5        On the fines, I agree with the Government that a

6   guideline fine in this case would not be a sufficient

7   punitive fine.

8        Sentencing Guidelines Section 5E1.2(d) states

9   that the amount of the fine should be sufficient to

10  ensure that the fine, taken together with other

11  sanctions, is punitive, and so I intend to impose a

12  fine of $100,000, which is well in excess of a

13  guideline fine but is just 40 percent of the amount

14  that you paid as a bribe in this case.  But I will

15  include on the judgment that, if restitution is

16  ultimately awarded, that would be -- the fine is

17  100,000 less the restitution that would be awarded.

18       So that is the sentence that I intend to impose.

19  It is a sentence that is sufficient but not greater

20  than necessary to accomplish the goals of sentencing.

21       Any objection before I formally impose -- oh,

22  I'm sorry.  All of the same -- all of the supervision

23  conditions that are listed in the presentence report at

24  Pages 36 to 38, a special assessment of $100 and no

25  restitution based on the amounts incurred prior to

1    August 31, but I will set a sentencing date -- a date

2    for hearing for restitution within 90 days for any

3    further costs that had not been determinable at that

4    time.

5         So with that, any objections before I formally

6    impose sentence?

7         MS. KEARNEY:  No, Your Honor.

8         MR. KENNER:  No objections, Your Honor.  But I

9    would ask that the Court make a judicial recommendation

10   to the lowest security camp at the Taft facility of the

11   Bureau of Prisons, and I would ask that he be allowed

12   to self-surrender to that facility.

13        THE COURT:  I'm happy to order a self-surrender,

14   and I'm happy to order a judicial recommendation to a

15   facility commensurate with his security level at a

16   particular location.  I am advised by the Bureau of

17   Prisons that they don't appreciate a particular

18   facility name.  So tell me what the location is where

19   you would like the --

20        MR. KENNER:  The location would be in the

21   Central District of California.

22        THE COURT:  We'll make that recommendation.

23        MR. KENNER:  And is Your Honor recommending a

24   camp or lower security?

25        THE COURT:  I will recommend the lowest security

1    commensurate with his security level.  The presentence

2    report shows no reason for there to be anything other

3    than the lowest security level.  But, again, the Bureau

4    of Prisons makes the determination from those facts.

5              MR. KENNER:  Yes.  Thank you, Your Honor.

6              THE COURT:  So Mr. Semprevivo, will you please

7    stand.

8              Pursuant to the Sentencing Reform Act of 1984,

9    and having considered the sentencing factors enumerated

10   at 18 USC, Section 3553(a), it is the judgment of the

11   Court that the Defendant, Stephen Semprevivo, is hereby

12   committed to the custody of the Bureau of Prisons to be

13   imprisoned for a term of four months.

14             I will make a judicial recommendation that you

15   be incarcerated at a facility commensurate with your

16   security level in the Central District of California,

17   and you will be permitted to self-surrender.  What date

18   would that be?

19             PROBATION OFFICER:  Your Honor, generally it's

20   four to six weeks for designation purposes.

21             THE COURT:  So November -- is that Tuesday,

22   November 7th?

23             PROBATION OFFICER:  I believe six weeks would be

24   Thursday, November 7th.

25             THE COURT:  Thursday, November 7th, for

self-reporting.

Upon release from imprisonment, you shall be placed on supervised release for a term of two years. And within 72 hours of release, you shall report in person to the district to which you are released.

I am ordering that you shall pay the United States a fine of $100,000, less any amount of restitution that is imposed, and that amount will be due after any determination and resolution of any -- I guess it's not technically an appeal if the victim disagrees with my findings, but it's a writ, but any resolution of those proceedings, 14 days after that.

While on supervision, you have to comply with the mandatory conditions of supervision. You must not commit another Federal, state or local crime. You must not unlawfully possess a controlled substance. Drug-testing conditions are suspended based on my determination that you pose a low risk of substance abuse. You must cooperate in the collection of DNA, as requested by the Probation Office.

The additional mandatory conditions: You must make restitution, if any is ordered, and pay the $100 assessment, which I guess I didn't say, but there's a $100 special assessment, and you must pay that, as imposed. You must also pay the fine in accordance with

1    the schedule I will set forth on the judgment.  And you

2    must notify the Court of any material change in your

3    economic circumstances that might affect your ability

4    to pay so long as any amounts are outstanding.

5         You shall comply with the standard conditions

6    that have been adopted by the Court, which are

7    described at Sentencing Guidelines Section 5D1.3(c).

8         And then, during the period of supervised

9    release, you must -- within six months from release of

10   custody, you must cooperate with the Examination and

11   Collection Division of the IRS.  You must provide to

12   the Examination Division all financial information

13   necessary to determine your prior tax liabilities.  You

14   must provide to the Collection Division all financial

15   information necessary to determine your ability to pay.

16   You must file accurate and complete tax returns for

17   those years for which returns were not filed or for

18   which inaccurate returns were filed, and you must make

19   a good-faith effort to pay all delinquent and

20   additional taxes, interest and penalties.

21        You're prohibited from incurring new credit

22   charges or opening additional lines of credit without

23   the approval of the Probation Office while any

24   financial obligations remain outstanding.  You must

25   provide the Probation Office access to any requested

financial information, which may be shared with the Financial Litigation Unit of the US Attorney while any financial obligations remain outstanding.

You must complete 500 hours of community service at an agency approved by the Probation Office; and, again, that would be an agency providing direct services to students or their families.  And the special assessment of $100.

With that, the sentence is imposed for all the reasons previously stated and because the Court believes the sentence, in all its components, is reasonable and is a sentence that is sufficient but not greater than necessary to accomplish the goals of sentencing, consistent with 18 USC, Section 3553, and the Supreme Court's guidance.

Your plea agreement with the Government limits your rights of appeal.  Under the terms of the plea agreement, you have waived your right to challenge your conviction on direct appeal or in a future proceeding, and you have waived your right to challenge your sentence on direct appeal or in a future proceeding. However, you may still appeal on the grounds of ineffective assistance or that the prosecutor engaged in misconduct.

So, with that, the sentence is imposed, as

1     stated.

2          There's no objection to -- you may be seated.

3          There's no objection to the Defendant remaining

4     released and self-reporting; correct?

5          MS. KEARNEY: Correct.

6          THE COURT: I find by clear and convincing

7     evidence that the Defendant is not likely to flee or

8     pose a danger to the safety of any other person or the

9     community if released, and he is released to

10     self-report, as stated.

11          Failure to surrender for service of sentence

12     pursuant to this judgment will result in a punishment

13     of a fine or imprisonment for not more than ten years

14     or -- and that any term of imprisonment shall be

15     consecutive to the sentence imposed here. If you're

16     convicted of an offense committed while on release, you

17     should be sentenced in addition to a term of

18     imprisonment of not more than ten years if the offense

19     is a felony or not more than one year if it is a

20     misdemeanor.

21          So, with that, you are directed to self-report

22     to the designated Bureau of Prisons facility in six

23     weeks.

24          Is there anything further?

25          MS. KEARNEY: No, Your Honor.

1    MR. KENNER:  No, Your Honor.

2    THE COURT:  And perhaps after you talk with

3 Georgetown, you can let my Clerk know if we need to set

4 a date for a further restitution hearing.

5    MS. KEARNEY:  We'll do that.  Thank you.

6    PROBATION OFFICER:  Your Honor, and I just want

7 to clarify for the record, I believe if you do issue a

8 restitution order and issue an amended judgment with a

9 restitution order, that you will then have to formally

10 amend the fine amount in accordance with that

11 restitution order.  I think that that's the clearest

12 way for the Accounting Department of our Clerk's Office

13 to understand what moneys are going toward the fine and

14 what moneys are going to the restitution without having

15 to do the math themselves, so to speak.  So I think, if

16 you are going to amend it and include restitution, you

17 also amend it and reduce the fine in accordance with

18 the contingency that you have outlined.

19    THE COURT:  Thank you.  I think the point is

20 well-taken, that it does need to be clear.  The reason

21 I'm wording it this way and not merely amending the

22 fine is under the understanding that, once I've imposed

23 a firm fine, I don't get to look back and change it,

24 and so I am making clear right now at the time of

25 judgment that the restitution would offset the fine.

1      MR. KENNER: Your Honor, may I just impose upon

2 the Court to make a request that we be provided with

3 discovery from the materials that were provided to the

4 Government from Georgetown, as they relate to

5 Mr. Semprevivo, for purposes of the restitution

6 hearing, if there is one?

7      THE COURT: So at this juncture, I've denied

8 Georgetown's request for restitution up through the

9 August 31 billing. They're welcome to file a motion

10 for seeking restitution for amounts incurred after

11 August 31, and you can make your request in connection

12 with that.

13      If they seek reconsideration of my order denying

14 restitution, which I denied on a purely procedural

15 issue, that they didn't file it ten days ahead, if they

16 seek reconsideration of that and I allow it, you're

17 welcome at that time to make your request for

18 discovery. But it's premature.

19      MR. KENNER: Thank you, Your Honor.

20      THE CLERK: Court is in recess. All rise.

21      (Adjourned 12:40 p.m.)

22

23

24

25

<u>C E R T I F I C A T I O N</u>

I, Debra D. Lajoie, RPR-FCRR-CRI-RMR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.




/s/ Debra D. Lajoie




9/29/19